# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE THE TRADE DESK, INC. DERIVATIVE LITIGATION | ) ) ) | Consol. C.A. No. 2022-0461-PAF |

## MEMORANDUM OPINION

Date Submitted: April 5, 2024
Date Decided: February 14, 2025

Stephen E. Jenkins, Marie M. Degnan, ASHBY & GEDDES, P.A., Wilmington, Delaware; Frank R. Schirripa, Daniel B. Rehns, Kurt Hunciker, Kathryn Hettler, Isaac G. Netzer, HACH ROSE SCHIRRIPA & CHEVERIE LLP, New York, New York; *Co-Lead Counsel and Attorneys for Lead Plaintiff International Union of Operating Engineers Local 137, 137A, 137B, 137C & 137R Pension & Annuity Funds*.

Stephen E. Jenkins, Marie M. Degnan, ASHBY & GEDDES, P.A., Wilmington, Delaware; Gregory Mark Nespole, Daniel Tepper, Correy A. Suk, LEVI & KORSINSKY, LLP, New York, New York; *Attorneys for Plaintiff Milton Pfeiffer*.

David A. Jenkins, Neal C. Belgam, Jason Z. Miller, SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware; Steven J. Purcell, Robert H. Lefkowitz, Anisha Mirchandani, PURCELL & LEFKOWITZ LLP, New York, New York; *Attorneys for Plaintiff Leroy Huizenga*.

Peter J. Walsh, Jr., Jacqueline A. Rogers, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Matthew Rawlinson, LATHAM & WATKINS LLP, Menlo Park, California; Colleen C. Smith, LATHAM & WATKINS LLP, San Diego, California; Kristin N. Murphy, LATHAM & WATKINS LLP, Costa Mesa, California; *Attorneys for Defendants Lise J. Buyer, Kathryn E. Falberg, Eric B. Paley, Gokul Rajaram, and David B. Wells, and Nominal Defendant The Trade Desk, Inc.*

Bradley D. Sorrels, Andrew D. Cordo, Lauren G. DeBona, WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; David J. Berger, WILSON SONSINI GOODRICH & ROSATI, P.C., Palo Alto, California; S. Toni Wormald, WILSON SONSINI GOODRICH & ROSATI, P.C., San Francisco, California; *Attorneys for Defendant Jeffrey Green*.

**FIORAVANTI, Vice Chancellor**

A corporation's board of directors granted its chief executive officer a performance-based equity grant that, if fully realized over ten years, would total 4% of the company's outstanding stock. The chief executive officer was also the corporation's controlling stockholder. The award was not submitted to a stockholder vote. Certain stockholders have challenged the award as a breach of fiduciary duty by the directors that approved it and the controller who received it. Under Delaware Supreme Court precedent, the claim against the controller is presumptively subject to review under the entire fairness standard.

Before the stockholder plaintiffs may pursue these claims, however, they must first establish a right to proceed with the litigation. These claims are assets of the corporation, and under Delaware's board-centric model, they fall under the board's control. To divest the board of its control over the litigation asset, the plaintiffs must demonstrate reasonable doubt as to the board's ability to consider a demand to bring the suit as of the time at which the plaintiffs filed the original complaint.

The board comprised eight directors at the time the original complaint was filed. Under Court of Chancery Rule 23.1, the plaintiffs must plead with particularity facts from which the court may infer that at least four of the eight directors received a material benefit, lack independence from the controller, or face a substantial likelihood of liability relating to the challenged conduct. Having considered the arguments and the particularized allegations in the operative

1

complaint, the court concludes that the plaintiffs have not met their burden. Accordingly, the defendants' motions to dismiss for failure to plead demand futility must be granted in full.

## I. BACKGROUND

The facts are drawn from the well-pleaded allegations of the Consolidated Amended Complaint (the "Complaint") and the documents integral thereto.[1] This includes documents produced to Plaintiffs in response to a books and records demand under 8 *Del. C.* § 220.

### A. The Parties

Each of the Plaintiffs has held The Trade Desk, Inc. Class A Common Stock at all relevant times.[2]

Nominal Defendant The Trade Desk, Inc. ("Trade Desk" or the "Company") is a publicly traded corporation with its principal place of business in Ventura, California.[3] At the time of the filing of the Complaint, Trade Desk was a Delaware corporation.[4] The Company has since converted into a Nevada corporation.[5]

---

[1] *See* Dkt. 15 [hereinafter "Compl."].

[2] *Id.* ¶ 16.

[3] *Id.* ¶¶ 17, 31.

[4] *Id.* ¶ 17.

[5] The Company's conversion into a Nevada corporation is the subject of other litigation in this court. *See Gunderson v. The Trade Desk, Inc.*, C.A. No. 2024-1029-PAF (Del. Ch.).

As of the date of the original complaint, the Company's board of directors (the "Board") comprised Jeffrey Green, David R. Pickles, Eric B. Paley, Lise J. Buyer, Kathryn E. Falberg, Gokul Rajaram, David B. Wells, and Andrea Cunningham (the "Demand Board").[6] All of the members of the Demand Board, except Cunningham and Pickles, are defendants in this action. This opinion refers to the individual director defendants, excluding Green, as the "Director Defendants." Falberg, Rajaram, and Wells were the members of the Board's compensation committee (the "Compensation Committee"), which negotiated and recommended that the Board approve the compensation package at issue in this action (the "Award").[7]

## B. Trade Desk's Founding and Green's Assumption of Control

Trade Desk is a technology company that provides digital advertising services.[8] Green and Pickles co-founded the Company in 2009.[9] Trade Desk is not Green's first entrepreneurial venture. In 2004, Green founded AdECN, Inc. ("AdECN"), the first exchange for online advertising.[10] Green led AdECN's

---

In the conversion action, the Company and its directors acknowledged that the Company's conversion into a Nevada corporation would have no bearing on the claims in this case. *See id.* Dkt. 20 at 10 n.6.

[6] Compl. ¶ 157.

[7] *Id.* ¶¶ 20, 22–23, 138.

[8] *Id.* ¶ 17.

[9] *Id.* ¶¶ 18, 25.

[10] *Id.* ¶ 160.

strategy, product, and business development, and three years after founding the business, Green sold AdECN to Microsoft Corp. for a rumored $50 to $75 million.[11]

Seven years after its founding, Trade Desk completed its initial public offering (the "IPO") in 2016 at a billion-dollar valuation.[12]  The Company has experienced significant growth ever since.[13]  In the roughly five years between its IPO and the Award, the Company's market capitalization grew to approximately $44 billion.[14]  Even Plaintiffs concede that Green "was instrumental" in the Company's success under his stewardship.[15]

The Company has two classes of common stock:  Class A Common Stock ("Class A") and Class B Common Stock ("Class B").[16]  In almost all respects, these two classes of stock are identical, but there are two notable differences:  (1) the Class A stock is entitled to one vote per share; the Class B stock is entitled to ten votes per

---

[11] *Id.*

[12] *Id.* ¶¶ 29, 192.

[13] *Id.* ¶¶ 29, 112, 192; Nasdaq, The Trade Desk, Inc. Class A Common Stock (TTD) Historical Quotes, https://www.nasdaq.com/market-activity/stocks/ttd/historical (last visited Feb. 14, 2025).  The court may take judicial notice of historic stock price data. *Lee v. Pincus*, 2014 WL 6066108, at *4 n.11 (Del. Ch. Nov. 14, 2014) (citing D.R.E. 201(b)(2)).

[14] Compl. ¶ 112.

[15] *Id.* ¶¶ 191, 194 (alleging that Founder Collective's "under $2 million initial investment [turned] into total profits of hundreds of millions of dollars" and that Green "was instrumental in making Paley hundreds of millions of dollars in profits").

[16] *Id.* ¶ 30.

share; and (2) the Class A stock is publicly traded; the Class B stock is not.[17] If Class B stock is transferred, other than pursuant to one of a handful of exceptions specified in the Company's certificate of incorporation, then it automatically converts into Class A stock.[18] At the time of the IPO, most of the Company's outstanding shares were Class B stock, but as pre-IPO investors sold their Class B stock over the years, the voting power of the Class B stock became more concentrated in the remaining Class B holders.[19] Following the IPO, Green held on to a large block of Class B stock.[20] As a result, Green's voting power increased from about 27% at the time of the IPO to 53% as of January 31, 2018.[21] Defendants do not dispute that Green remained the Company's controlling stockholder when Plaintiffs initiated this action.[22]

---

[17] *Id.* ¶¶ 30–31.

[18] *Id.* ¶ 31.

[19] *Id.* ¶¶ 32–36.

[20] *Id.* ¶ 33.

[21] *Id.* ¶¶ 32, 37. The Company's dual-class stock structure was originally designed to expire once the Class B stock made up less than 10% of the Company's outstanding stock, at which time all remaining Class B stock would convert into Class A stock. *Id.* ¶ 47. In 2020, stockholders approved an amendment to the Company's certificate of incorporation extending the longevity of Green's control via this dual-class structure. *See generally City Pension Fund for Firefighters & Police Officers in City of Mia. v. The Trade Desk, Inc.*, 2022 WL 3009959 (Del. Ch. July 29, 2022) (dismissing a stockholder complaint challenging the certificate amendment).

[22] Green Opening Br. 6; Trade Desk & Director Defs.' Opening Br. 4; *see also* Compl. ¶ 1.

## C. Green's Historic Compensation Packages

The Compensation Committee must annually review the chief executive officer's ("CEO") compensation.[23]  Every year since the Company's IPO, the Compensation Committee has awarded Green a compensation package consisting of a base salary, equity awards, and performance-based cash bonuses, valued at $6,122,218 in 2017, $10,782,252 in 2018, $12,135,473 in 2019, $15,927,482 in 2020, and $16,042,476 in 2021 (excluding the Award).[24]  The Company explained that these packages were designed to reward Green's performance and structured to match the 75th percentile relative to the Company's compensation peer group.[25]

## D. The Award

The Compensation Committee first formally discussed the possibility of a large equity award for Green on December 4, 2020.[26]  At that time, the Compensation Committee's legal adviser was Latham & Watkins LLP ("Latham"), and its compensation consultant was Compensia, Inc. ("Compensia").[27]  Prior to the

---

[23] Dkt. 22 Ex. 8 Art. IV § 1.

[24] Compl. ¶¶ 55–56, 58–59, 61.

[25] *Id.* ¶¶ 57–58, 60, 62.

[26] *Id.* ¶ 89; Dkt. 22 Ex. 16.

[27] Dkt. 22 Ex. 16.

meeting, Compensia circulated a slide presentation to the Compensation Committee (the "Compensia Presentation").[28] The slide presentation stated that:

> The Compensation Committee at The Trade Desk asked Compensia to assist in evaluating CEO compensation alternatives, with the following objectives:
> [(1)] Support CEO retention, engagement and commitment for the next 7 years
> [(2)] Motivate significant long-term shareholder value creation [and]
> [(3)] Recognize unique value associated with J. Green's continued engagement as TradeDesk's CEO[.][29]

According to the minutes of the meeting, Erik Beucler of Compensia reviewed the Compensia Presentation, which "set[] forth considerations in connection with large equity grants for CEOs and model[ed] certain potential terms and scenarios for the Committee's consideration."[30] The Compensia Presentation included two other compensation structures—the Company's historic approach to Green's compensation and a "Large Cap" compensation approach—in slides that compared them to what Compensia labeled a "mega grant."[31] The Compensia Presentation included a "Straw Model: Stock Price Targets only" and accompanying

---

[28] *Id.* at TTD_Huizenga000469.

[29] *Id.* Ex. 27 at TTD_Huizenga000760 [hereinafter "Compensia Presentation"].

[30] *Id.* Ex. 16 at TTD_Huizenga000469.

[31] Compensia Presentation at TTD_Huizenga000762; *see id.* at TTD_Huizenga000762–65.

7

considerations for a so-called mega grant, but not for other structures.[32] The "Straw Model" presented an award for up to 2% of the Company's outstanding stock conditioned upon an increase in the Company's market capitalization by roughly 130%.[33] The award under the Straw Model would fall between the 60th and 75th percentile of comparable CEO mega grants.[34] Other features of the Straw Model specified that award tranches would only be achievable after four years and would be contingent on Green remaining as CEO.[35] Latham advised the Compensation Committee about "the disclosure obligations, legal considerations and litigation risks associated with a potential large CEO equity grant."[36]

The Compensation Committee next met on January 6, 2021.[37] Green attended the meeting along with Jay Grant, the Company's chief legal officer, Blake Grayson, the Company's chief financial officer, and Vina Leite, the Company's chief people officer.[38] The meeting began with discussion of the Company's executive compensation and equity plans in general.[39] Grant, Grayson, and Leite then left the

---

[32] *Id.* at TTD_Huizenga000763.

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] Dkt. 22 Ex. 16 at TTD_Huizenga000469.

[37] Dkt. 22 Ex. 17 at TTD_Huizenga000470.

[38] *Id.*

[39] *Id.* at TTD_Huizenga000471.

meeting, after which Green and the Compensation Committee met in closed session to "Review CEO Grant Analysis."[40] According to the minutes: "Mr. Green discussed his views of executive and CEO compensation. Questions were asked and discussion ensued, and the Committee determined to consider a large CEO equity grant further."[41] Green then left the meeting, and the Compensation Committee "discussed various matters" and approved the Company's executives' 2021 cash compensation in closed session before adjourning.[42]

On January 13, 2021, the Compensation Committee met again, this time joined by Buyer and Green's counsel, who had been invited "to participate and facilitate the Committee's discussions around a potential significant equity grant to the Company's CEO and potentially another member of the management team."[43] "It was discussed that Wilson Sonsini Goodrich & Rosati would represent Mr. Green; and it was determined that Latham & Watkins will represent the Company and the Committee on legal matters related to this topic and Compensia will continue to advise the Committee as compensation consultant to the Committee."[44] The

---

[40] *Id.*

[41] *Id.*

[42] *Id.* at TTD_Huizenga000471–72.

[43] *Id.* Ex. 18 at TTD_Huizenga000474. It is not apparent from the record who this additional member of the management team was, and no such award was ultimately granted.

[44] *Id.*

9

Compensation Committee reviewed the key terms of the proposed awards with its advisors and "determined to seek input from Mr. Green . . . on his thoughts around how a significant equity grant might be structured in order to properly incentivize key management team members and to be well received by the Company's stockholders."[45] The Compensation Committee asked Green's counsel to "discuss the matter with Mr. Green and then revert with input for the Committee's consideration."[46]

At the Compensation Committee's next meeting on January 22, 2021, Green's counsel relayed Green's views about the contemplated grant.[47] The minutes do not specify what Green's counsel relayed.[48] The Compensation Committee "discussed certain of the key terms."[49] Falberg requested that Green's counsel confer with Green and revert with additional input for the Compensation Committee.[50]

On February 3, 2021, the Compensation Committee met again, and its business was not limited to the proposed CEO grant. Green, Grant, Grayson, and

---

[45] *Id.* at TTD_Huizenga000475.

[46] *Id.*

[47] *Id.* Ex. 19 at TTD_Huizenga000476.

[48] The Compensation Committee's minutes are not detailed. Generally speaking, they document the occurrence of a meeting, those in attendance, and a general summary of what transpired.

[49] *Id.*

[50] *Id.* at TTD_Huizenga000476–77.

Leite attended the meeting.[51] While management was present, the Compensation Committee proceeded through general business, including bonus and equity plans, and the upcoming transition of the Company's chief strategy officer ("CSO").[52] After the Compensation Committee completed its general business, Green, Grant, Grayson, and Leite left the meeting.[53] Buyer and Paley then joined at the invitation of the Compensation Committee "to provide input to the [Compensation] Committee on the size and framework for the grant."[54] During the meeting, the Compensation Committee reviewed and acknowledged the independence of its advisers.[55]

The next day, at a regular meeting of the full Board, the Compensation Committee reported on the previous day's meeting.[56] The Board minutes identify several topics from Falberg's presentation to the Board, but the contemplated mega grant is not among them.[57]

---

[51] *Id.* Ex. 20 at TTD_Huizenga000478.

[52] *Id.* at TTD_Huizenga000479.

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.* Ex. 14 at TTD_Huizenga000454–56.

[57] *Id.* at TTD_Huizenga000456. Pickles was elected to the Board at the end of this meeting to fill the gap left by the departing CSO, and the Board appointed Buyer as lead independent director. *Id.* at TTD_Huizenga000457.

On February 18, 2021, the Board held a special meeting without Green or Pickles.[58] The directors were joined by the Compensation Committee's counsel, Green's counsel, and Beucler from Compensia.[59] Falberg reported on "recent discussions related to a potential significant performance equity grant for Mr. Green and potentially another executive team member," and Green's counsel discussed the potential framework for such an award and examples from similar awards.[60] The Board discussed the framework and considerations for such an award, and "decided to continue to consider such a performance equity grant for Mr. Green."[61] Green's counsel left the meeting, and the Board continued its discussion in a closed session before adjourning.[62]

The Compensation Committee met again on April 26, 2021.[63] Latham was present, but Compensia did not attend.[64] The minutes are sparse. The substantive description is reduced to one sentence: "The Committee members met and discussed

---

[58] *Id.* Ex. 15 at TTD_Huizenga000458.

[59] *Id.*

[60] *Id.*

[61] *Id.* at TTD_Huizenga000458–59.

[62] *Id.* at TTD_Huizenga000459.

[63] *Id.* Ex. 21.

[64] *Id.* at TTD_Huizenga000481.

various matters in connection with the framework for a potential CEO equity grant and recent discussions therewith."[65]

The Compensation Committee met again the next day.[66]  Green and three other senior managers (Grant, Grayson, and Leite) were in attendance.[67]  Consistent with prior meetings where management was in attendance, the Compensation Committee first discussed general business, then excused management (other than Green), after which it discussed the mega grant.[68]  After management was excused from this meeting, the Compensation Committee discussed a framework for the award with Green and then excused him from the meeting to allow the committee members to deliberate with their advisers.[69]

The Compensation Committee's next meeting, on July 15, 2021, was similar to others with management invited to attend for part of the meeting to discuss general compensation matters.[70]  After excusing members of management, the Compensation Committee and its advisers discussed the framework for the mega

---

[65] *Id.*

[66] *Id.* Ex. 22.

[67] *Id.* at TTD_Huizenga000482.

[68] *Id.* at TTD_Huizenga000483–84.

[69] *Id.* at TTD_Huizenga000484.

[70] *See generally id.* Ex. 23.  Green, Grant, Grayson, and Leite attended the meeting.  *Id.* at TTD_Huizenga000487.  Rajaram was not in attendance and the minutes do not state the reason for his absence.  *Id.*

13

grant with Green's counsel,[71] including vesting thresholds and an adjustment of each tranche based on the Company's performance relative to the Nasdaq 100.[72]

On August 3, 2021, the Compensation Committee, joined by Buyer, discussed the framework for the mega grant, and the Compensation Committee's advisers relayed input from Green's counsel on which positions Green could hold without forfeiting the award, the length of any holding period, and the length of the measurement period for the achievement of milestones.[73] "The Committee members instructed [Compensia] to update the summary of terms for the potential grant and instructed [Latham] to communicate with Mr. Green regarding the status of discussions."[74]

On September 17, 2021, the Compensation Committee, again joined by Buyer, discussed a revised proposal for the equity grant based on input from Green's advisers.[75] No Compensia representative was present at this meeting. After

---

[71] Green's counsel is not listed as an attendee but is referenced multiple times in the summary of the Compensation Committee's discussion of the mega grant. *Compare id.* at TTD_Huizenga000487, *with id.* at TTD_Huizenga000488.

[72] *Id.* at TTD_Huizenga000488.

[73] *Id.* Ex. 24 at TTD_Huizenga000489. It is not clear from the minutes why Buyer was present at this meeting.

[74] *Id.*

[75] *Id.* Ex. 25 at TTD_Huizenga000491.

discussion, the Compensation Committee resolved to recommend the mega grant to the Board.[76]

On October 6, 2021, the full Board held a special meeting, joined by several members of management, the Compensation Committee's counsel, Beucler from Compensia, and Green's counsel.[77] Falberg and Beucler explained the background and structure for the mega grant, members of management discussed its accounting implications and the communications plan, and the Compensation Committee's counsel discussed the related SEC disclosures and amendment to Green's employment agreement.[78] Non-director members of the management team left the meeting, and the directors "continued discussion."[79] Green, Pickles, and Green's counsel then left the meeting, and the Director Defendants "continued discussion" before unanimously approving the Award and accompanying amendment to Green's employment agreement.[80]

As approved, the Award differed structurally from the Straw Model mega grant in the December 2020 Compensia Presentation.[81] For example, the Straw

---

[76] *Id.* at TTD_Huizenga000492; Compl. ¶ 138.

[77] Dkt. 22 Ex. 26 at TTD_Huizenga000496.

[78] *Id.* at TTD_Huizenga000496–97.

[79] *Id.* at TTD_Huizenga000497.

[80] *Id.*

[81] *Compare id.* at TTD_Huizenga000500–09, *with* Compensia Presentation at TTD_Huizenga000763.

Model mega grant had included a five-year time-vesting requirement for an award that could grant options to purchase up to 2% of the Company's outstanding equity for increasing the Company's stock price by approximately 130% over five to seven years and had an estimated $352 million grant date fair value.[82] By contrast, the final Award had no time-vesting limitation for achieving an award granting options to purchase up to 4% of the Company's outstanding equity for increasing the Company's stock price by approximately 400% over a ten-year period and had an $819 million grant date fair value.[83] The final Award was divided into eight vesting tranches, and each tranche provided Green with the option to purchase 2,000,000 shares of Class A stock.[84] The final Award also provided for +/-20% adjustments to the size of the tranches based on the Company's performance to-date relative to the 100 companies in the Nasdaq 100 on October 6, 2021.[85] Some main comparative differences are that the final Award eliminated the Straw Model's time-vesting requirement entirely, raised the price targets in the final Award above those depicted

---

[82] Compensia Presentation at TTD_Huizenga000763–64.

[83] Dkt. 22 Ex. 26 at TTD_Huizenga000500–01; Compl. ¶ 4.

[84] Dkt. 22 Ex. 26 at TTD_Huizenga000500–01.

[85] *Id.* at TTD_Huizenga000502. If, at the time a tranche vested, the Company's total shareholder return ("TSR") fell below the 50th percentile for this group, the tranche would be adjusted downward by 20%. *Id.* If the TSR hit the 50th percentile exactly, the tranche would not be adjusted. *Id.* If the TSR reached or exceeded the 75th percentile, the tranche would be adjusted upward by 20%. *Id.* If the TSR fell between the 50th and 75th percentiles, a percentage adjustment would be made based on a linear interpolation between 0% and 20%. *Id.*

16

in the Straw Model,[86] and doubled both the maximum size of the Award and its vesting period. The final Award did not include any operational or financial targets, conditioning vesting only on stock price.[87]

To receive any benefits from the final Award, Green was required to remain CEO for four years.[88] Green continues to remain eligible for payouts thereafter if he remains in a strategic position approved by the Board.[89] If Green is terminated from a qualifying position for "Cause," as defined,[90] the Award terminates immediately.[91] If Green is terminated without Cause or leaves for "Good Reason," as defined, the Award terminates nine months after his departure.[92] The Award does

---

[86] In the Straw Model, Green could receive up to 2% of the Company's outstanding equity for 130% stock price growth, while in the final Award, 170% stock price growth would be necessary to receive the first 2% of the Company's outstanding equity, assuming no relative performance-based adjustments were triggered. *Compare* Compensia Presentation at TTD_Huizenga000763, *with* Dkt. 22 Ex. 26 at TTD_Huizenga000501. The Award's ten-year duration did give Green longer to hit these higher targets. That being said, if the Company's performance lagged behind its peers, the TSR-based adjustments would reduce the size of any vesting tranches, including any tranches that might vest only by virtue of the Award's longer duration. If the Company outpaced its peers, Green still had to hit the higher targets for tranches to vest but would be rewarded with more options under the TSR-based adjustments.

[87] Compl. ¶¶ 14, 92, 151(b); *see* Dkt. 22 Ex. 26 at TTD_Huizenga000500.

[88] Dkt. 22 Ex. 26 at TTD_Huizenga000500, TTD_Huizenga000503, TTD_Huizenga000507–08.

[89] *Id.*

[90] In conjunction with the Award, the Company removed "gross negligence" from its definition of Cause. Compl. ¶ 85(c).

[91] Dkt. 22 Ex. 26 at TTD_Huizenga000503, TTD_Huizenga000507, TTD_Huizenga000509.

[92] *Id.* at TTD_Huizenga000503, TTD_Huizenga000508–09.

not preclude Green from receiving cash compensation or additional equity awards during the vesting period.[93] The Company did not seek stockholder approval of the Award, and no other Company executives received similar compensation packages.[94] One tranche of the Award vested before Plaintiffs filed this action, pursuant to which Green received options to purchase 2,400,000 shares of Class A stock at $68.29 per share.[95]

### E.    Procedural History

On August 18, 2022, the court consolidated two stockholder derivative actions challenging the Award.[96] On November 10, 2022, Plaintiffs filed a consolidated amended complaint,[97] which relies in part on documents that the Company produced to Plaintiffs in response to books and records demands under 8 *Del. C.* § 220.[98]

All defendants have moved to dismiss under Court of Chancery Rule 23.1 for failure to plead demand futility and under Court of Chancery Rule 12(b)(6) for

---

[93] *Id.* at TTD_Huizenga000517; Compl. ¶¶ 61, 151(a).

[94] Compl. ¶¶ 14, 92, 128, 151(e).

[95] *Id.* ¶ 86.

[96] Dkt. 10 ¶ 2. Plaintiff Leroy Huizenga filed his complaint on May 27, 2022. Dkt. 1. Plaintiffs International Union of Operating Engineers Local 137, 137A, 137B, & 137R Pension & Annuity Funds and Milton Pfeiffer filed their complaint a month later. *Int'l Union of Operating Eng'rs Loc. 137, 137A, 137B & 137R Pension & Annuity Funds v. Green*, C.A. No. 2022-0560-PAF (Del. Ch.), Dkt. 1.

[97] Dkt. 15.

[98] Compl. at 1 n.1.

failure to state a claim upon which relief can be granted.[99]  The parties have briefed and presented argument on the motions, and have submitted supplemental authority for the court's consideration.[100]

## II.  ANALYSIS

The Defendants moved to dismiss the Complaint under Court of Chancery Rules 23.1 and 12(b)(6), contending that Plaintiffs cannot assert this action on behalf of the Company and that, in any event, Plaintiffs fail to state a claim upon which relief can be granted.  The court concludes that dismissal is warranted under Rule 23.1.  Therefore, it need not reach Defendants' arguments under Rule 12(b)(6).

### A.  Stockholder Challenges to Executive Compensation for Controllers

There is a tension in our law regarding review of transactions involving controlling stockholders and executive compensation decisions.  On the one hand, "[t]he directors of a Delaware corporation have the authority and broad discretion to make executive compensation decisions."  *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 138 (Del. Ch. 2009).  Accordingly, "a board's decision on executive compensation is entitled to great deference.  It is the essence of business judgment for a board to determine if a particular individual warrants large amounts of money, whether in the form of current salary or severance provisions."  *Brehm v.*

---

[99] Dkts. 21–22.

[100] Dkts. 21–22, 27, 31–32, 40, 54–55.

*Eisner*, 746 A.2d 244, 263 (Del. 2000) (cleaned up); *accord Tornetta v. Musk* (*Tornetta I*), 250 A.3d 793, 796–97 (Del. Ch. 2019) ("A board of directors' decision to fix the compensation of the company's executive officers is about as work-a-day as board decisions get. It is a decision entitled to great judicial deference."); *see also id.* at 797 (explaining that stockholder approval of executive compensation typically results in "even greater deference," if properly obtained).

"On the other hand, as pled, the Award is a transaction with a conflicted controlling stockholder." *Tornetta I*, 250 A.3d at 797. "[I]n a suit claiming that a controlling stockholder stood on both sides of a transaction with the controlled corporation and received a non-ratable benefit, entire fairness is the presumptive standard of review." *In re Match Gp., Inc. Deriv. Litig.*, 315 A.3d 446, 451 (Del. 2024).

As Vice Chancellor Slights observed in *Tornetta I,* these approaches "do[] not jibe." 250 A.3d at 798. But this conceptual tension is just that, and the doctrinal path is clear: under well-established law, despite the considerable deference our courts afford compensation decisions, they are not immune from judicial review. "Like any other interested transaction, [fiduciary] self-compensation decisions lie outside the business judgment rule's presumptive protection, so that, where properly challenged, the receipt of self-determined benefits is subject to an affirmative showing that the compensation arrangements are fair to the corporation." *Telxon*

20

*Corp. v. Meyerson*, 802 A.2d 257, 265 (Del. 2002); *accord Valeant Pharms. Int'l v. Jerney*, 2007 WL 2813789, at *10 (Del. Ch. Mar. 1, 2007) ("Where the self-compensation involves [fiduciaries] paying themselves bonuses, the court is particularly cognizant to the need for careful scrutiny."). "Self-interested compensation decisions made without independent protections are subject to the same entire fairness review as any other interested transaction." *Valeant*, 2007 WL 2813789, at *10; *accord In re Invs. Bancorp, Inc. S'holder Litig.*, 177 A.3d 1208, 1224–25 (Del. 2017), *as revised* (Dec. 19, 2017) (explaining that, absent properly employed protective mechanisms, conflicted compensation decisions are subject to entire fairness review).

In the recent *Match* decision, our Supreme Court specifically identified compensation decisions to controlling stockholders as a transaction that is presumptively subject to review under the entire fairness standard. 315 A.3d at 451–52, 465 & n.129. As the *Match* Court also explained, a defendant in these circumstances can obtain a pleadings-stage dismissal in one of two ways. First, a defendant can satisfy the *MFW* framework, under which the transaction must be negotiated by an independent and disinterested special committee and approved by a fully informed, uncoerced vote of the unaffiliated stockholders. *Id.* at 451. Second, a defendant can obtain dismissal under Rule 23.1 for failure to plead demand futility. *Id.* at 451–52 ("Of course, derivative claims against controlling stockholders, which

21

typically arise from ordinary course transactions such as compensation decisions and intercompany agreements, are subject to Court of Chancery Rule 23.1 and our demand review precedent."); *see In re BGC P'rs, Inc. Deriv. Litig.*, 2019 WL 4745121, at *7 (Del. Ch. Sept. 30, 2019) (observing that Rule 23.1 "is not automatically satisfied when the challenged transaction would be subject to entire fairness review because it involves a controlling stockholder" (emphasis omitted)).[101] "[I]n the demand context even proof of majority ownership of a company does not strip the directors of the presumptions of independence, and that their acts have been taken in good faith and in the best interests of the corporation." *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)[102]; *accord Beam ex rel. Martha Stewart*

---

[101] "Admittedly, there is [also] a tension in our law" between the presumptive application of the entire fairness standard to conflicted controller transactions and the lack of a presumption that demand is futile in the same context. *Match*, 315 A.3d at 469. But as the Court explained, "*Aronson* and our demand review precedent stand apart from the substantive standard of review in controlling stockholder transactions. The distinction is grounded in the board's statutory authority to control the business and affairs of the corporation, which encompasses the decision whether to pursue litigation." *Id.*

[102] In *Brehm*, the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested a deferential appellate review. *See Brehm*, 746 A.2d at 253–54 & n.13. The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. *Id.* at 253–54. The seven partially overruled precedents otherwise remain good law. *See Match*, 315 A.3d at 459 n.85 (acknowledging the narrow scope of *Brehm*'s ruling on this point); *id.* at 869 (relying on "*Aronson* and our demand review precedent"); *see also In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 43 n.17 (Del. Ch. 2013).

*Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1054 (Del. 2004) ("A stockholder's control of a corporation does not excuse presuit demand on the board without particularized allegations of relationships between the directors and the controlling stockholder demonstrating that the directors are beholden to the stockholder."). "Stated differently, the potential that the entire fairness standard may govern Plaintiff's breach of fiduciary duty claim against . . . an alleged controlling stockholder . . . does not remove that claim . . . from" Rule 23.1's pleading requirements. *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 68 (Del. Ch. 2015); *accord Lenois v. Lawal*, 2017 WL 5289611, at *13 n.103 (Del. Ch. Nov. 7, 2017) ("Thus, I do not find demand excused simply because the proper standard of review is entire fairness solely due to an interested transaction with a conflicted controller.").

The Defendants did not attempt to satisfy *MFW*. Instead, they argue that demand is not excused and, therefore, the Complaint must be dismissed under Rule 23.1.

## B. Standard of Review

Section 141(a) of the Delaware General Corporation Law ("DGCL") provides that a corporation "shall be managed by or under the direction of [its] board of directors." 8 *Del. C.* § 141(a); *McRitchie v. Zuckerberg*, 315 A.3d 518, 536 (Del. Ch. 2024) ("That statutory grant of authority forms the foundation of Delaware's

board-centric model of governance."). This managerial authority includes whether the corporation should "initiate, or refrain from entering, litigation." *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981); *accord United Food & Com. Workers Union v. Zuckerberg* (*Zuckerberg II*), 262 A.3d 1034, 1047 (Del. 2021) ("The board's authority to govern corporate affairs extends to decisions about what remedial actions a corporation should take after being harmed, including whether the corporation should file a lawsuit against its directors, its officers, its controller, or an outsider.").

Plaintiffs seek to pursue a claim on behalf of the Company, thereby "divest[ing] the directors of their authority to control the litigation asset." *Lenois*, 2017 WL 5289611, at *9. "The question of whether a stockholder may act as a volunteer in taking up the cudgels in behalf of his corporation . . . is one of his right and authority to act." *Ainscow v. Sanitary Co. of Am.*, 180 A. 614, 615 (Del. Ch. 1935). Rule 23.1 provides a mechanism whereby a stockholder may do so, but it sets a high bar.

> The complaint in a derivative action must:
>     (1) state with particularity:
>         (A) any effort by the derivative plaintiff to obtain the desired action from the entity; and
>         (B) the reasons for not obtaining the action or not making the effort; and
>     (2) allege facts supporting a reasonable inference that the derivative plaintiff has standing to sue derivatively under the law governing the entity.

Ct. Ch. R. 23.1(a). The "stringent requirements of factual particularity . . . differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a)." *Brehm*, 746 A.2d at 254.

The demand requirement in Rule 23.1 "is a basic principle of corporate governance and is a matter of substantive law." *Grimes v. Donald*, 673 A.2d 1207, 1216 (Del. 1996) (internal quotation marks omitted), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). It is "a substantive requirement that ensures that a stockholder exhausts his intracorporate remedies, provides a safeguard against strike suits, and assures that the stockholder affords the corporation the opportunity to address an alleged wrong without litigation and to control any litigation which does occur." *Zuckerberg II*, 262 A.3d at 1047 (cleaned up).

The Plaintiffs in this action did not make a pre-suit demand. Therefore, before Plaintiffs may litigate these claims on behalf of the corporation, they must persuade the court that any demand on the Board to pursue the claims is excused as futile.

Demand is futile if at least half of the members of the Demand Board are unable to consider a demand for one of the three reasons outlined in *Zuckerberg II*:

(i)   [T]he director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;

(ii)  [T]he director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; [or]

(iii) [T]he director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a

25

substantial likelihood of liability on any of the claims that are the subject of the litigation demand.

*Id.* at 1059. "To comply with Rule 23.1, the plaintiff must meet 'stringent requirements of factual particularity that differ substantially from . . . permissive notice pleadings.'" *Id.* at 1048 (alteration in original) (quoting *Brehm*, 746 A.2d at 254). "When considering a motion to dismiss a complaint for failing to comply with Rule 23.1, the Court does not weigh the evidence, must accept as true all of the complaint's particularized and well-pleaded allegations, and must draw all reasonable inferences in the plaintiff's favor." *Id.* That being said, however, "[v]ague or conclusory allegations do not suffice to challenge the presumption of a director's capacity to consider demand," and the plaintiff's allegations must satisfy the "stringent requirements of factual particularity." *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 985 (Del. Ch. 2007), *as revised* (Aug. 20, 2007) (internal quotation marks omitted); *Grimes*, 673 A.2d at 1214 ("Conclusory statements without supporting factual averments will not be accepted as true for purposes of a motion to dismiss."). "This analysis is fact-intensive and proceeds director-by-director and transaction-by-transaction," *Khanna v. McMinn*, 2006 WL 1388744, at *14 (Del. Ch. May 9, 2006), and "assesses the ability of the Board in place as of the date of the filing of a complaint." *Schoenmann v. Irvin*, 2022 WL 1792976, at *12 (Del. Ch. June 2, 2022).

26

The burden at this stage is on the Plaintiffs to overcome a defendant-friendly presumption. "It is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson*, 473 A.2d at 812; *Beam*, 845 A.2d at 1048 ("The key principle upon which this area of our jurisprudence is based is that the directors are entitled to a *presumption* that they were faithful to their fiduciary duties."). "In the context of presuit demand, the burden is upon the plaintiff in a derivative action to overcome that presumption." *Beam*, 845 A.2d at 1048–49.

At the time of the original complaint, the Demand Board had eight members. It is undisputed that Green would not be able to consider a demand regarding a suit challenging the Award. It is also undisputed that Cunningham would be able to consider a demand. The parties hotly contest the ability of the remaining six directors to consider a demand: Pickles, Paley, Buyer, Falberg, Rajaram, and Wells. To survive dismissal under Rule 23.1, Plaintiffs must raise a reasonable doubt as to the ability of three of these six contested directors to consider demand. Plaintiffs insist that demand is futile as to each of those six directors because they lack independence from Green, face a substantial likelihood of liability, or both.

**C.** **Plaintiffs Contend that There Is Reason to Doubt Whether Four Members of the Demand Board Are Independent of Green.**

Plaintiffs do not challenge the independence of Cunningham, Rajaram, or Wells. Plaintiffs do, however, argue that Pickles, Paley, Buyer, and Falberg lack independence from Green, the recipient of the Award.

> To create a reasonable doubt about an outside director's independence, a plaintiff must plead facts that would support the inference that because of the nature of a relationship or additional circumstances other than the interested director's stock ownership or voting power, the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director.

*Beam*, 845 A.2d at 1052. "When assessing director independence, our courts do not 'anthropologize' directors as simply *homo economicus*; instead, other factors, including personal and business relationships, can influence and, at times, compromise independence. As commentators have noted, Delaware's independence analysis is context-specific and fact-intensive." *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at *29 (Del. Ch. Jan. 27, 2021), *as corrected* (Feb. 4, 2021). Director independence may be compromised by a single conflict or a constellation of lesser connections. *Cal. Pub. Empls.' Ret. Sys. v. Coulter*, 2002 WL 31888343, at *9 (Del. Ch. Dec. 18, 2002) ("Our cases have determined that personal friendships, without more; outside business relationships, without more; and approving of or acquiescing in the challenged transactions,

28

without more, are each insufficient to raise a reasonable doubt of a director's ability to exercise independent business judgment." (footnotes omitted)).

An additional overlay to the independence inquiry is Green's position as the Company's controlling stockholder. But this, alone, does not render demand futile. A derivative plaintiff cannot successfully rebut the presumption of a director's ability to consider demand by simply alleging the director was elected or appointed by an interested party, or even a controller. *Aronson*, 473 A.2d at 815–16; *see Zuckerberg II*, 262 A.3d at 1061–64 (determining that there was no reasonable doubt about the independence of a majority of the directors from the controlling stockholder); *see also In re Rouse Props., Inc.*, 2018 WL 1226015, at *15 (Del. Ch. Mar. 9, 2018) (recognizing that "the appointment of a director onto the board, even by the controlling stockholder, is insufficient to call into question the independence of that director"); *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006) ("The fact that Cox and Comcast nominated directors to the At Home board does not, without more, establish actual domination or control. To hold otherwise would have a chilling effect on transactions that depend on a particular shareholder being able to appoint representatives to an investee's board of directors." (footnote omitted)). To be sure, a director's appointment by a controller "is not necessarily irrelevant." *In re Ezcorp Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *41 (Del. Ch. Jan. 25, 2016), *as modified on reargument* (Feb. 23,

2016); *accord In re HomeFed Corp. S'holder Litig.*, 2020 WL 3960335, at \*14 (Del. Ch. July 13, 2020) ("Although the presence of a controller does not alone overcome the presumption of director independence, it is relevant when considering Plaintiffs' allegations holistically."). But "[t]here must be coupled with the allegation of control such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person." *Aronson*, 473 A.2d at 815; *see id.* at 816 ("It is the care, attention and sense of individual responsibility to the performance of one's duties, not the method of election, that generally touches on independence.").

### 1. There is reason to doubt Pickles's independence.

Pickles is both an officer and a director of Trade Desk.[103] Pickles's relationship with Green dates back to 2007, when Green hired Pickles to work at AdECN.[104] Green and Pickles worked together at AdECN for two years, after which they co-founded Trade Desk in November 2009.[105] Pickles then left his previous employer to become Trade Desk's chief technology officer ("CTO") in March 2010, a position that he has held continuously through the filing of this action.[106] Pickles derives his principal income from his compensation as CTO, earning $4.26 million

---

[103] Compl. ¶¶ 157, 162.

[104] *Id.* ¶ 161.

[105] *Id.* ¶¶ 161–62.

[106] *Id.* ¶ 162.

in 2019, $4.79 million in 2020, and $7.24 million in 2021.[107]   Pickles does not

qualify as an independent director under the NASDAQ listing requirements, and the

Company acknowledges as much.[108]  Pickles recused himself from the Board's vote

approving the Award.[109]

Pickles, as the highly compensated[110] CTO of a corporation that Green

controls, cannot impartially consider a demand to initiate litigation challenging

Green's compensation.  The proposition that "senior corporate officers generally

lack independence for purposes of evaluating matters that implicate the interests of

---

[107] *Id.* ¶ 163.

[108] *Id.* ¶ 165.

[109] *Id.* ¶ 169; Dkt. 22 Ex. 26 at TTD_Huizenga000497.

[110] Plaintiffs allege that Pickles "received a compensation package valued at $4.26 million in 2019, $4.79 million in 2020, and $7.24 million in 2021," an average of $5.43 million over the three-year period preceding this suit.  Compl. ¶ 163.  These sums are presumptively material at the motion to dismiss stage. *Orman v. Cullman*, 794 A.2d 5, 31 (Del. Ch. 2002), *as revised* (Mar. 1, 2002) ("I think it would be naïve to say, as a matter of law, that $3.3 million is immaterial."); *see also In re The Limited, Inc. S'holders Litig.*, 2002 WL 537692, at *5 (Del. Ch. Mar. 27, 2002) ("[D]uring the years 1996–1998, he averaged $1.8 million in salary and bonuses.  It is reasonable to infer that compensation of this magnitude is material to him.").  Adjusting for inflation, Pickles's $5.43 million average compensation between 2019 and 2021 is greater than the $1.8 million at issue in *Limited* and the $3.3 million at issue in *Orman*.  A $1.8 million salary in January 1998 would have the same buying power as just over $3.25 million in May 2022, and a $3.3 million payment in March 2002 would have the same buying power as almost $5.4 million in May 2022.  *See* U.S. Dep't of Labor, Bureau of Labor Statistics, *CPI Inflation Calculator*, https://www.bls.gov/data/inflation_calculator.htm; *see Menacker v. Overture, L.L.C.*, 2020 WL 4463438, at *17 & n.7 (Del. Ch. Aug. 4, 2020) (taking judicial notice of the U.S. Consumer Price Index on a motion to dismiss); *see also In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 813 (Del. Ch. 2022) ("A greater than half-million-dollar payout is presumptively material at the motion to dismiss stage.").

a controller" is supported by "the great weight of Delaware precedent." *Voigt v. Metcalf*, 2020 WL 614999, at \*16 (Del. Ch. Feb. 10, 2020) (collecting cases). Pickles's lengthy professional relationship with Green further strengthens the reasonable inference that Pickles could not impartially consider a demand to pursue litigation to challenge the Award. *See Coulter*, 2002 WL 31888343, at \*9 ("[I]t is a reasonable inference from the alleged particularized facts that the combination of relationships between Coulter and Mandigo, along with Coulter's position as CEO of the company that employs Mandigo's son, would be sufficiently material to preclude Mandigo from being able to consider demand without improper considerations intervening.").

> Absent some unusual fact—such as the possession of inherited wealth—the remuneration a person receives from her full-time job is typically of great consequence to her. It is usually the method by which bills get paid, health insurance is affordably procured, children's educations are funded, and retirement savings are accumulated.

*In re The Student Loan Corp. Deriv. Litig.*, 2002 WL 75479, at \*3 n.3 (Del. Ch. Jan. 8, 2002). Defendants do not attempt to rebut the inference that Pickles's salary and other employment benefits are material to him.

For the foregoing reasons, there is reason to doubt that Pickles can consider a demand impartially.

### 2. There is not reasonable doubt about Paley's independence from Green.

Paley is a co-founder of Founder Collective, a seed-stage venture capital fund.[111] Paley and his two co-founders make a point of being the largest investors in each of their funds, "[s]o when entrepreneurs take our money, it's really our money."[112] Founder Collective was one of the Company's initial two investors in 2010.[113] Paley joined the Board at the time and has remained a Trade Desk director ever since.[114] Founder Collective's investment in the Company of under $2 million yielded over $100 million in profits over the course of its nine-year investment.[115] Green has invested in Founder Collective's 2016 and 2020 third and fourth funds.[116] From these particularized allegations, Plaintiffs offer a host of arguments to cast doubt about Paley's independence from Green.

First, Plaintiffs contend that instituting suit against Green would have negative implications on Paley's and Founder Collective's future earning potential. Plaintiffs highlight the significant return that Founder Collective has enjoyed from its early investment in Trade Desk and favorable comments about Green and the Company

---

[111] Compl. ¶¶ 180–81.

[112] *Id.* ¶ 182 (emphasis and internal quotation marks omitted).

[113] *Id.* ¶ 185.

[114] *Id.*

[115] *Id.* ¶¶ 185, 190–91.

[116] *Id.* ¶¶ 182, 193.

33

on Founder Collective's website and Paley's social media. According to Plaintiffs, Paley's reputation and earning potential are "inextricably intertwined with his relationship with Green."[117] From this, Plaintiffs contend that Paley lacks independence because he harbors a sense of "owingness" to Green and that instituting suit against Green would have negative consequences on Paley and Founder Collective.

Plaintiffs' argument takes their particularized allegations too far. It is reasonable to infer that Paley and Founder Collective value their business relationship with Trade Desk and Green, but viewed holistically, the allegations do not create reasonable doubt as to Paley's independence from Green. Trade Desk is not Founder Collective's only investment. According to the Complaint, "[s]ince its founding in 2009, Founder Collective has invested in hundreds of companies."[118] Nor is Trade Desk a lone success story among Founder Collective's investments. As described in an article cited in the Complaint, Founder Collective "backed ten companies that have either exited or been valued at more than $1 billion in [its] first two funds."[119] In light of the pleadings-stage record on Founder Collective's

---

[117] Pls.' Answering Br. 74.

[118] Compl. ¶ 183.

[119] Connie Loizos, *Founder Collective barrels forward, closing its fourth and newest fund with $85 million*, TechCrunch (May 20, 2020),

34

investments, Plaintiffs have not offered particularized allegations that Paley's service on Trade Desk's Board is material to him. *See Zuckerberg II*, 262 A.3d at 1063 (explaining that, given a director's wealth and stature, "[t]he complaint does not support an inference that Thiel's service on the Board is financially material to him. Nor does the complaint sufficiently allege that serving as a Facebook director confers such cachet that Thiel's independence is compromised" (alteration in original) (internal quotation marks omitted)). Plaintiffs' allegations that Paley and Founder Collective benefited from their association with Trade Desk lack the particularity necessary to satisfy Rule 23.1. *See id.* ("While the complaint alleges that Founders Fund gets good deal flow from Thiel's high-profile association with Facebook, the complaint does not identify a single deal that flowed to—or is expected to flow to—Founders Fund through this association, let alone any deals that would be material to Thiel's interests." (footnote and internal quotation marks omitted)). Similarly, the reputational impacts of instituting suit against a founder do

---

https://techcrunch.com/2020/05/20/founder-collective-barrels-forward-closing-its-fourth-and-newest-fund-with-85-million/; *see* Compl. ¶¶ 182–83 (citing and quoting material from the TechCrunch article). The court considers this article to be incorporated by reference in the Complaint. *See Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 96 n.2 (Del. 2013) ("A judge may consider documents outside of the pleadings [] when . . . the document is integral to a plaintiff's claim and incorporated in the complaint . . . ." (citing *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996)).

not, alone, give rise to a reasonable inference that Paley would be unable to consider a demand impartially.[120]

Plaintiffs next point to Paley's favorable public statements and social media posts about his experience with Green and the Company. For example, on the day of Trade Desk's IPO, Paley posted "So lucky to have worked with [Green] from day 1 of [the Company]. What an amazing journey. Thank you!" with a picture of the two of them at the IPO launch.[121] From these particularized allegations, Plaintiffs

---

[120] Plaintiffs cite *Goldstein v. Denner*, 2022 WL 1671006 (Del. Ch. May 26, 2022), in support of their argument that "Trade Desk is by far Founder Collective's most successful investment, and Paley could not help but wonder what the impact on his firm's business would be, and what existing and potential clients would think, if he repaid Green by suing him." Pls.' Answering Br. 79 (citing *Goldstein*, 2022 WL 1671006, at \*47–48 & n.31). The discussion in *Goldstein* upon which Plaintiffs rely was, however, about repeat director nominees, not the venture capitalists themselves, and relied on case law discussing a lack of independence where directors "had previously served on the board of directors of at least two other [fund portfolio] companies" and "previously received $30,000 from [the controller] for agreeing to be a director nominee in [the controller's] proxy bid for another company" in support of the proposition that "when an influential party has bestowed a directorship on an individual in the past or has the power to reward an individual with directorships in the future, then the individual may seek to serve the interests of that influential party." 2022 WL 1671006, at \*47 (alterations in original) (internal quotation marks omitted). That is not to say that the court is blind to the possibility that Paley might engage in such a pragmatic calculus before deciding to institute suit against Green. But Plaintiffs have not presented particularized allegations giving rise to a reasonable inference that this would so dominate Paley's decision-making as to render him unable to impartially consider demand. *See id.* at \*49 ("Outside of a Rule 12(b)(6) motion in a case governed by enhanced scrutiny, it is unlikely that a similar constellation of facts would be sufficient to overcome the presumption of good faith or to call a director's independence into question. For example, the reasonable doubt standard used in a demand futility analysis provides a higher hurdle for a plaintiff than the relatively lenient standard of review pursuant to Rule 12(b)(6)." (internal quotation marks omitted)).

[121] Compl. ¶ 188.

argue that "Paley's confession of feeling so lucky and thankful to be part of Green's success with Trade Desk, success that was incredibly profitable for Paley personally, is tantamount to an admission that Paley harbors a sense of owingness towards Green."[122] Plaintiffs overstate the legal force of these statements.

"[M]ere recitation of the fact of past business or personal relationships will not make the Court automatically question the independence of a challenged director." *Orman*, 794 A.2d at 27 n.55. A plaintiff must "plead additional facts concerning the length, nature or extent of those previous relationships that would put in issue that director's ability to objectively consider the challenged transaction." *Id.* Paley's positive statements and past profits do not provide the plus-factor Plaintiffs need to overcome "the general rule that past relationships do not call into question a director's independence." *In re Freeport-McMoran Sulphur, Inc. S'holder Litig.*, 2005 WL 1653923, at *12 (Del. Ch. June 30, 2005); *cf. id.* at *11–12 (denying summary judgment because material issues of fact remained as to a director's ability to objectively consider the challenged transaction where he "viewed the Freeport entities as one collective unit and . . . spent his entire professional career at Freeport-McMoRan" and "had worked for the Common Directors for almost twenty years and had become a wealthy individual in their employ"); *BGC P'rs*, 2019 WL

---

[122] Pls.' Answering Br. 78 (cleaned up).

4745121, at *12 (inferring "a sense of owingness[] upon which a reasonable doubt as to a director's loyalty to a corporation may be premised" where the controller donated "at least $65 million" to the school at which the director was provost during the director's tenure, the director's board compensation was material, and the controller had placed the director on multiple boards (internal quotation marks omitted)); *Marchand v. Barnhill*, 212 A.3d 805, 820 (Del. 2019) (concluding that there was reasonable doubt that a director could act impartially where "the pled facts fairly support the inference that Rankin owes an important debt of gratitude and friendship to the Kruse family for giving him his first job, nurturing his progress from an entry level position to a top manager and director, and honoring him by spearheading a campaign to name a building at an important community institution after him"). In many ways, Plaintiffs' arguments mirror those in *Zuckerberg II* that were unsuccessful in challenging the independence of Peter Theil, an entrepreneur and venture capitalist. 262 A.3d at 1062–63 (concluding that allegations including "Thiel was one of the early investors in Facebook, [and] is its longest-tenured board member besides Zuckerberg," "Thiel is Zuckerberg's close friend and mentor," and "[a]ccording to Facebook's 2018 Proxy Statement, the Facebook shares owned by the Founders Fund (*i.e.*, by Thiel and Andreessen) will be released from escrow in connection with an acquisition" did not raise a reasonable doubt as to Thiel's ability to consider demand (internal quotation marks omitted)). The allegations as to Paley

38

similarly fail, as none of Plaintiffs' allegations or arguments that Paley harbors a sense of "owingness" to Green create a reasonable doubt as to Paley's independence.

Plaintiffs also seek to impugn Paley's presumption of independence by casting his relationship with Green as a personal one. For this, Plaintiffs again point to certain of Paley's public statements and social media posts about working with Green and Trade Desk. Plaintiffs also highlight Paley's statement that he and Green "have had a phone call at least every two weeks by [Green's] insistence" between 2011 and, at least, 2015.[123] Plaintiffs also point to Green's having invested in Founder Collective's third and fourth funds.[124]

One consistent through-line for each of Plaintiffs' allegations—with one exception—is that they relate to Paley's and Green's professional capacities relative to Trade Desk. Complementing a successful portfolio company and publicly celebrating its IPO are part of being an effective venture capital investor. *Cf. United Food & Com. Workers Union v. Zuckerberg* (*Zuckerberg I*), 250 A.3d 862, 894 (Del. Ch. 2020), *aff'd*, 262 A.3d 1034 (Del. 2021) ("It is both expected and customary for a chair and CEO to comment favorably on a new director who is joining the board. Nothing about the post suggests a relationship of a bias-producing nature."). Communicating regularly with the Company's CEO while Trade Desk was a private

---

[123] Compl. ¶ 187 (emphasis and internal quotation marks omitted).
[124] *Id.* ¶ 193.

company demonstrates Paley's interest as a director and investor. It also reflects Green's desire to keep Paley informed. But these allegations do not raise a reasonable doubt as to Paley's independence. *See Zuckerberg II*, 262 A.3d at 1063 ("The complaint does not explain why Thiel's . . . contributions to Facebook's business strategy make him beholden to Zuckerberg.").

Plaintiffs also emphasize that Paley has been on the Board for 12 years. But this alone does not convert Green and Paley's 12-year working relationship into a personal one. The particularized allegations here fall far short of those where personal relationships created doubt as to a director's independence. For example, in *Delaware County Employees Retirement Fund v. Sanchez*, 124 A.3d 1017 (Del. 2015), the "director ha[d] been *close friends* with an interested party for a *half century*." *Id.* at 1022 (emphasis added); *see id.* ("Close friendships of that duration are likely considered precious by many people, and are rare. People drift apart for many reasons, and when a close relationship endures for that long, a pleading stage inference arises that it is important to the parties."). Unlike in *Sanchez*, Plaintiffs here do not allege that Paley and Green are friends—in fact, the word "friend" does not even appear in the Complaint.[125] The Complaint contains no particularized

---

[125] Nor does Plaintiffs' briefing use the word to describe Paley and Green's relationship either. A version of "friend" appears but four times in Plaintiffs' brief: once to describe the relationship in *Sanchez* as one between "close friends," and three times to emphasize that Rule 12(b)(6) is a "plaintiff-friendly" standard. Pls.' Answering Br. 77, 94–95, 97.

allegations that are comparable to the 50-year close friendship in *Sanchez*. Nor are the Complaint's allegations even close to *Sandys v. Pincus*, 152 A.3d 124 (Del. 2016), where a director was deemed to lack independence from a controller with whom the director co-owned a private airplane, which "signaled an extremely close, personal bond between" the director and controller. *Id.* at 130; *see id.* ("Co-ownership of a private plane involves a partnership in a personal asset that is not only very expensive, but that also requires close cooperation in use, which is suggestive of detailed planning indicative of a continuing, close personal friendship.").

This leaves Green's investments in Founder Collective's third and fourth funds, which Paley disclosed in a director questionnaire inquiring into "relationships" the "Board should consider in evaluating your independence."[126] This particularized allegation identifies a business relationship suggestive of a level of trust and respect involving matters outside the Company's board room. *See Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *14 (Del. Ch. July 26, 2018) ("It is true that allegations of a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence. But it does not follow that a business relationship between a director and an

---

[126] Compl. ¶ 193 (internal quotation marks omitted).

41

interested party can never undermine the presumption of director independence." (cleaned up)). The question is one of degree: based on Plaintiffs' particularized allegations, is this a relationship that, alone, provides reason to doubt Paley's ability to consider demand, or is it a "without more" allegation that gets added to the mix of allegations that must be considered holistically?

Plaintiffs do not plead with particularity the size of Green's investments in these funds. Plaintiffs brush this aside, arguing that "it is reasonable to infer that Green's investment is more than nominal" because "it is not plausible that Green would have bothered to make only token investments."[127] But merely inferring that Green invested more than a nominal sum does not satisfy Plaintiffs' burden under Rule 23.1 to plead with particularity. Paley is alleged to have invested more of his own money in each fund than Green, and it is not reasonable to infer that Green's minority investments in a couple of eight-figure funds would give reason to doubt Paley's independence from Green. The magnitude of Paley's and Green's minority investments in two eight-figure funds stand in stark contrast to those that have been found to implicate a director's independence. In *Liberty Broadband*, this court concluded that a director was, for pleadings-stage purposes, unable to consider demand based only on entities in which the director and interested party each had

---

[127] Pls.' Answering Br. 80–81.

significant minority interests co-investing in joint ventures worth approximately $1 billion. 2018 WL 3599997, at *14.[128] The *Liberty Broadband* court acknowledged that "more information would perhaps have made the pleadings stronger," but concluded that significant interests in $1 billion in co-investments "suffices to impugn [the director's] independence at the pleading stage." *Id.* Plaintiffs' allegations of Paley's and Green's smaller interests in funds totaling $160 million pales in comparison to those at issue in *Liberty Broadband*, leading to the conclusion that this relationship is not enough to cast a reasonable doubt as to Paley's ability to consider demand. *See In re Goldman Sachs Gp., Inc. S'holder Litig.*, 2011 WL 4826104, at *11 (Del. Ch. Oct. 12, 2011) (concluding that a director *could* consider demand despite a defendant having invested "at least $670 million in funds managed by" the director in part because there were no allegations that the director relied on managing those funds (internal quotation marks omitted)).[129] Therefore, the court

---

[128] The director was one of three founders of a private equity firm that held a 40% interest in the joint ventures. *Liberty Broadband*, 2018 WL 3599997, at *13. The remaining 60% interest was held by a corporation in which the interested party was a 25% owner and served as board chairman. *Id.* The business enterprise "became the largest cable company in Puerto Rico." *Id.*

[129] Plaintiffs' other proffered authorities in support of the proposition that this was a "long-standing pattern of mutually advantageous business relations" itself creating doubt as to Paley's ability to consider demand are similarly inapposite. Pls.' Answering Br. 80 (internal quotation marks omitted); *cf. Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 889 (Del. Ch. 1999) (explaining that it was reasonably conceivable that a director was unable to impartially consider demand because the court could infer that the director lacked

concludes that Green's investing in Founder Collective's funds provides insufficient support, either alone or together with Plaintiffs' other allegations, to doubt Paley's ability to consider demand.

### 3. There is not reasonable doubt about Buyer's independence from Green.

Buyer is a principal at Class V Group LLC ("Class V Group"), a consulting firm that she co-founded in 2006.[130] "Buyer has only one employee at Class V Group," and Buyer's "principal source of income" since 2006 has been through her consulting firm.[131] Class V Group advises companies going public through initial public offerings or direct listings, working with approximately four companies each year.[132] Green engaged Buyer in 2015 to advise on the Company's IPO, for which she was paid $175,000 in cash and received an option to purchase 2,500 shares of

---

independence from his brother-in-law who had been the director's boss, co-founder, co-investor, and co-director at various entities over the course of 30 years); *Sandys*, 152 A.3d at 133–34 (finding reason to doubt the ability of two directors to consider demand where the two were partners in a firm that owned 9.2% of the controlled company, invested in another company co-founded by the controller's wife, and invested in a third company with another party who allegedly benefited from the challenged transaction); *In re Loral Space & Commc'ns Inc.*, 2008 WL 4293781, at *6, *17 (Del. Ch. Sept. 19, 2008) (explaining, post-trial, that a director's solicitation of $70 million in investments from the controller while negotiating the challenged transaction with the controller evidenced a "close relationship" between the director and controller). The magnitude of business relationships in these cases is not comparable to that of Paley's business relationship with Green here.

[130] Compl. ¶ 170; Dkt. 22 Ex. 1 at 9.

[131] Compl. ¶ 170.

[132] *Id.* ¶¶ 170, 173.

Trade Desk stock at the then-current price.[133]  Buyer's consulting work for the Company ended in early 2017.[134]

Buyer joined the Board in March 2019.[135]  The Company determined then that she was not independent under the NASDAQ rules,[136] "presumably due to her" consulting work for the Company within the prior three years.[137]  The Company has since reclassified Buyer as an independent director, and she was appointed as the Board's "lead independent" director in February 2021.[138]  The Company paid Buyer $535,558 for her Board service in 2019, $408,492 in 2020, and $314,176 in 2021.[139]

In Buyer's 2021 director and officer questionnaire, she identified her prior consulting engagement with the Company as a "material relationship" and noted that she has listed Trade Desk as a reference for future consulting jobs.[140]  Buyer

---

[133] *Id.* ¶ 172.

[134] *Id.*

[135] *Id.* ¶ 176.

[136] *Id.* ¶ 177.

[137] Pls.' Answering Br. 87; *see Sandys*, 152 A.3d at 132 (explaining that, outside of exceptions not applicable here, accepting "any compensation from the Company in excess of $120,000 during any period of twelve consecutive months within the three years preceding the determination of independence" "automatically preclude[s] a finding of independence" under the NASDAQ rules (internal quotation marks omitted)).

[138] Compl. ¶ 177.

[139] *Id.* ¶ 178.

[140] *Id.* ¶ 174; Dkt. 32 Ex. 30 at TTD_Huizenga000341.

"presume[s] some potential clients may have spoken with management at the Company and may have subsequently hired" her.[141]

Plaintiffs argue that Buyer lacks independence from Green because she lists the Company as a reference, earns good money as a director, and previously provided consulting work for the Company—all benefits Plaintiffs contend can be taken away by Green. Plaintiffs argue that Buyer's prior classification as not independent under the NASDAQ rules is another pertinent factor for consideration in the analysis of whether she is independent of Green.

Buyer's receipt of director compensation does not undermine her independence. "Delaware law recognizes that directors will be paid a fair and reasonable amount. For that reason, when director fees are not excessive, mere allegations of payment of director fees are insufficient to create a reasonable doubt as to the director's independence." *Simons v. Brookfield Asset Mgmt. Inc.*, 2022 WL 223464, at *15 (Del. Ch. Jan. 21, 2022). Plaintiffs do not argue that Buyer's director fees are excessive, and her mere receipt of payment for her board service does not create a reasonable doubt as to her independence from Green. Plaintiffs' sole allegation on this point—that "given that her only other source of income is her consulting work, the handsome compensation she receives as a Trade Desk director

---

[141] Compl. ¶ 175 (alteration in original) (quoting Dkt. 32 Ex. 30 at TTD_Huizenga000341).

46

is material to Buyer"—is conclusory.[142]  Plaintiffs make no attempt to compare

Buyer's director's fees with her other sources of income or accumulated wealth, and

this bare assertion does not satisfy Rule 23.1's particularity requirement.[143]

At its core, Plaintiffs' argument as to Buyer is the same as their argument with

respect to Pickles—Plaintiffs contend that Buyer lacks independence from Green

because he could affect her livelihood.  The allegation sticks to Pickles.  Pickles is

the Company's CTO and a subordinate to Green—the Company's CEO and

controlling stockholder—who could directly affect Pickles's livelihood.  By

contrast, Buyer does not work for the Company (other than serving on the Board)

and runs her own business, which does not do any work for the Company.  And

---

[142] *Id.* ¶ 179.  Plaintiffs allege that Buyer's "principal source of income" since 2006 has been through Class V Group. *Id.* ¶ 170.

[143] Buyer's classification as not independent under the NASDAQ rules in 2019 is similarly unpersuasive.  It is well established "that 'the criteria NASDAQ has articulated as bearing on independence are relevant under Delaware law,'" but they do not control this court's independence analysis under Rule 23.1. *In re Kraft Heinz Co. Deriv. Litig.*, 2021 WL 6012632, at *12 (Del. Ch. Dec. 15, 2021) (quoting *Sandys*, 152 A.3d at 131), *aff'd*, 282 A.3d 1054 (Del. 2022) (TABLE).  Buyer had been classified as independent under the NASDAQ rules for years by the time Plaintiffs filed this suit, which is the relevant date for purposes of determining Buyer's independence.  To the extent Buyer's independence classification under the NASDAQ rules carries any weight, it is against Plaintiffs. *See Ezcorp*, 2016 WL 301245, at *36 ("The fact that a director qualifies as independent for purposes of a governing listing standard is [] a helpful fact which, all else equal, makes it more likely that the director is independent for purposes of Delaware law.").  Furthermore, the fees paid to Buyer's consulting firm five years before Plaintiffs initiated this suit do not move the needle here.  Plaintiffs do not allege that Buyer's work in connection with the Company's IPO was anything other than an arms-length arrangement in which Buyer performed her usual services for her standard compensation.

given the narrow scope of Class V Group's focus—advising on go-public transactions—there is no reasonable expectancy that the Company would ever re-hire the firm.

Plaintiffs are then left with inferences to be drawn from Buyer's listing the Company as a reference for new engagements. These allegations do not create a reasonable doubt as to Buyer's ability to consider a demand impartially. None of the authorities Plaintiffs proffer regarding the potentially conflicting nature of consulting relationships were decided under Rule 23.1,[144] and none of them were based upon consulting services that terminated half a decade before the filing of the complaint.[145] To call into question the independence of a director based upon her

---

[144] *See In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745 (Del. Ch. May 3, 2004), *as revised* (June 4, 2004) (post-trial entire fairness analysis); *Loral*, 2008 WL 4293781 (post-trial entire fairness analysis); *Orman*, 794 A.2d 5 (motion to dismiss under Rule 12(b)(6)); *HomeFed*, 2020 WL 3960335 (motion to dismiss under Rule 12(b)(6)); *Trade Desk*, 2022 WL 3009959 (discussing, but not deciding, this same relationship on a motion to dismiss under Rule 12(b)(6)). Moreover, one of the cases Plaintiffs rely upon expressly distinguished the lower pleading threshold under which it was decided from that which is controlling here. *Goldstein*, 2022 WL 1671006, at *2, *49 ("In granting the plaintiff a pleading-stage inference sufficient to keep Protopapas [the analysis of whose independence Plaintiffs reply upon here] and Germano in the case, this decision has taken into account that the defendants moved to dismiss under Court of Chancery Rule 12(b)(6), which imposes a lower pleading standard than a motion to dismiss under Court of Chancery Rule 23.1, where particularized pleading is required. . . . To survive a motion to dismiss under Rule 23.1, for example, a plaintiff would have to plead more.").

[145] *Cf. Sandys*, 152 A.3d at 126, 130, 134 (concluding that demand was futile based on particularized allegations of one director's "very close personal relationship that, like family ties, one would expect to heavily influence a human's ability to exercise impartial judgment" and two other directors' "mutually beneficial ongoing business relationship"

serving as a consultant, the complaint must allege facts to show the conflicted party had a more direct influence over the director's future workflow than has been asserted here.[146] Rather, Plaintiffs' allegations here are comparable to those rejected

with the conflicted party across several "interlocking relationships"); *BGC P'rs*, 2019 WL 4745121, at *11–14 (concluding that demand was futile based on particularized allegations of, among other things, (i) one director's professional relationship with the controlling stockholder "span[ning] approximately twenty years, during which [the director] has served with [the controlling stockholder] on the boards of *four* [controller]-affiliated companies"; (ii) a second director's benefiting professionally from $65 million in donations by the controlling stockholder and service on multiple boards at his behest; and (iii) a third director's ties to the controlling stockholder pre-dating even his ten years on the board, inclusion on a public list of the controller's potential board appointees, and the materiality of the director fees to the director).

[146] *See, e.g.*, *Klein v. H.I.G. Cap., L.L.C.*, 2018 WL 6719717, at *11 (Del. Ch. Dec. 19, 2018) (concluding that a controlling stockholder's control over the renewal of a consulting agreement that paid a director more than his previous salary as CEO, along with other allegations, created reasonable doubt as to the director's ability to consider a demand impartially). The same is true of assessments of independence in the non-derivative cases upon which Plaintiffs rely. *See Emerging Commc'ns*, 2004 WL 1305745, at *34 (finding that a director who was on an annual $200,000 retainer with one of the controller's entities, viewed the controller "as a source of additional future lucrative consulting fees," and recently sought a $2 million fee for providing advisory services was not independent); *id.* at *33 (finding another director who was the controller's "long time lawyer," and virtually all of his fees generated over the prior three-year period were attributable to services for the controller and his entities, was "clearly conflicted" and not independent); *Loral*, 2008 WL 4293781, at *6, *17 ("Harkey and Rachesky [MHR's principal] were business school classmates at Stanford, have maintained a 'long-time friendship,' and serve as business resources and references for each other. Based on Rachesky's recommendation, Harkey serves as a director on three boards . . . . Harkey's close relationship with MHR was evidenced by the fact that he was personally soliciting [a total of $70 million of unrelated, personal] investments from MHR late in the negotiation process." (footnotes omitted)); *Orman*, 794 A.2d at 30 (concluding that it was reasonable to infer that a director was beholden to the controlling shareholders for future renewals of his existing consulting contract); *HomeFed*, 2020 WL 3960335, at *13 (determining that it was reasonably conceivable that a director lacked independence where "aside from his HomeFed director role, Bienvenue's consulting role was his 'sole employment'" and the conflicted party controlled both positions).

49

by our Supreme Court in *Zuckerberg II*, where the Court concluded that generalized allegations that a director benefited from increased "deal flow" were insufficient to impair his independence. 262 A.3d at 1063 ("While the complaint alleges that Founders Fund gets good deal flow from Thiel's high-profile association with Facebook, the complaint does not identify a single deal that flowed to—or is expected to flow to—Founders Fund through this association, let alone any deals that would be material to Thiel's interests." (footnote and internal quotation marks omitted)). Plaintiffs' arguments fail here for the same reason: their generalized allegations lack the particularity Rule 23.1 requires.[147]

---

[147] *See, e.g.*, Compl. ¶ 179 (alleging that "Buyer would likely consider whether initiating a suit against Green would cause Green to no longer serve (or allow Trade Desk to serve) as her consulting reference"). Plaintiffs take this argument still further in their briefing, contending that, "[s]ince the income Buyer receives from her consulting business and her directorship at Trade Desk are her only sources of income and she relies on Green to sustain both sources, there is a reasonable pleadings-stage inference to be drawn that Buyer is essentially 'all in' on Team Green and therefore beholden to him." Pls.' Answering Br. 86 (emphasis omitted). But based on the particularized allegations in the Complaint, it is not reasonable to infer that Buyer relies on Green to sustain her consulting business. As is apparent from the very director and officer questionnaire upon which Plaintiffs rely, and as this court has previously observed, Buyer has extensive experience in a variety of hefty roles, including as Director of Business Optimization at Google, General Partner of a venture capital firm, and Director of Internet/New Media Research at Credit Suisse First Boston. Dkt. 32 Ex. 30 at TTD_Huizenga000342. She has been running Class V Group since 2006 and has over 15 years of experience doing this precise type of consulting work. Additionally, as Plaintiffs allege, Buyer aims to work with "about four companies per year." Compl. ¶ 173 (emphasis omitted) (internal quotation marks omitted). Even conservatively assuming that Buyer only worked with three companies per year since founding Class V Group, she would still have roughly 50 available references. The potential to impair one of those references does not raise a reasonable doubt that Buyer would be unable to consider a demand impartially.

Considered individually or together, Plaintiffs' allegations that Buyer lacks independence from Green fall short of Rule 23.1's pleading requirements, and the court concludes that Buyer would be able to consider demand impartially.

### 4. There is not reasonable doubt about Falberg's independence from Green.

Falberg was an early investor in AdECN and served as its Chief Financial Officer ("CFO") in the months leading up to its acquisition by Microsoft in 2007.[148] Falberg joined the Board six days before the Company announced its IPO, and she has served as a member of the Compensation Committee and the Nomination and Corporate Governance Committee since.[149] Around the time Plaintiffs filed this action, Falberg held approximately $14.4 million in Trade Desk Class A stock, and over 100,000 shares of Class B stock.[150]

Both prior to and after her time at AdECN, Falberg served as the CFO for several companies, ending her last such position in 2014.[151] Since 2004, Falberg has served as a director of at least 13 publicly traded companies,[152] and, at the time of the Complaint, she served on the boards of four publicly traded companies, in

---

[148] Compl. ¶¶ 195–97.

[149] *Id.* ¶¶ 199, 201. The Company issued an expected and customary press release in connection with Falberg's joining the Board, which featured positive statements from Falberg and Green. *Id.* ¶¶ 199–200; *see Zuckerberg I*, 250 A.3d at 894.

[150] Compl. ¶ 203.

[151] *Id.* ¶¶ 195–96, 198.

[152] *Id.* ¶¶ 205–06.

51

addition to Trade Desk.[153]  The director fees from these positions are Falberg's principal source of income.[154]  Plaintiffs do not allege that Green had any role in Falberg's obtaining any of her other directorships.

Plaintiffs contend that Falberg's previous work at AdECN, significant holdings of Trade Desk stock, and director fees impair her ability to consider demand.  Individually and collectively, Plaintiffs' allegations fall short.

First, Falberg's brief overlap with Green at AdECN does not undermine the presumption of her independence.  Unlike Pickles, who continued to work with Green at Microsoft and then co-founded the Company with him, Falberg spent a matter of months at AdECN.[155]  Plaintiffs do not allege any interaction between her and Green over the following nine years.  Falberg's brief tenure at AdECN, which ended 15 years before this action, her 2003 investment in AdECN, and her six-year tenure on the Board do not, individually or collectively, create reason to doubt her independence from Green.  *See Zuckerberg II*, 262 A.3d at 1063 ("The complaint does not explain why [Falberg's] status as a long-serving board member[] [or] early investor . . . make [her] beholden to [Green].").

---

[153] *Id.* ¶ 205.

[154] *Id.* ¶ 204.

[155] *Id.* ¶ 197.

Second, the timing of Falberg's first obtaining Trade Desk stock does not affect her independence. Plaintiffs allege that "while Trade Desk still was private, Falberg owned 30,303 shares (which have since split ten-for-one)," and that she owns Trade Desk Class A stock worth more than $14 million.[156] Plaintiffs argue that "[i]f Green had not appointed Falberg to the Board before the Company's IPO, she would not own millions of dollars in Trade Desk stock."[157] The Complaint does not, however, actually allege when or how Falberg acquired these shares. In any event, that Falberg has derived substantial wealth from holdings in Trade Desk does not impair her independence from Green. There are no allegations that Green "has any means to deprive [Falberg] of the wealth [Falberg] has accumulated, or that [Green] has the ability to deprive [Falberg] of wealth—let alone wealth that is material to [Falberg]—going forward." *McElrath ex rel. Uber Techs., Inc. v. Kalanick*, 2019 WL 1430210, at \*18 (Del. Ch. Apr. 1, 2019), *aff'd*, 224 A.3d 982 (Del. 2020). Of course, it is possible for past benefits of sufficient materiality in the specific circumstances of a particular director to give rise to a sense of owingness. *See BGC P'rs*, 2019 WL 4745121, at \*12. But Plaintiffs have not made particularized allegations regarding a past benefit that would give rise to a sense of owingness that would affect Falberg's independence from Green, and Falberg's

---

[156] *Id.* ¶ 203.

[157] Pls.' Answering Br. 90.

ownership of Trade Desk stock does not create reason to doubt her independence. *Owens ex rel. Esperion Therapeutics, Inc. v. Mayleben*, 2020 WL 748023, at \*10 (Del. Ch. Feb. 13, 2020) ("Nor does our law infer a lack of director independence simply because that director owns stock in the company on whose board he sits; indeed, that dynamic is common and is generally regarded as a desirable alignment of incentives between fiduciaries and beneficiaries."), *aff'd*, 241 A.3d 218 (Del. 2020), *as corrected* (Nov. 18, 2020) (TABLE). Plaintiffs' allegations regarding Falberg's stock holdings provide Plaintiffs no support.[158]

Finally, Plaintiffs argue that Falberg's fees for her board service with the Company are material to her. The Complaint highlights that Falberg has earned approximately $1,868,344 over the course of her time on the Board and, on average, a little over $300,000 per year.[159] The Complaint also alleges that Falberg's other

---

[158] Plaintiffs' allegation that "Falberg thus owes a substantial portion of her net worth to Green's decision to appoint her to the Board" also fails for lack of specificity. Compl. ¶ 203. Merely asserting that Falberg's Trade Desk stock constitutes "a substantial portion of her net worth," without attempting to contextualize those holdings or quantify her net worth, is conclusory and falls short of Rule 23.1's requirement that Plaintiffs plead with particularity.

[159] *Id.* ¶ 202. Plaintiffs' reliance on *Trados* for the proposition that a "salary of $1 million is material" misconstrues the nature of the conflict they purport to analogize. Pls.' Answering Br. 91 n.326 (citing *Trados*, 73 A.3d at 46). As a factual matter, the only salary identified on the page to which Plaintiffs cite was $190,000 plus unspecified bonuses, and the $1 million payment discussed therein was a one-time payment in connection with the challenged transaction. *Trados*, 73 A.3d at 46. Moreover, the director estimated his net worth to be $2 to $4 million, so the $1 million payment alone increased the director's

---

54

income is derived from other directorships.[160]  Plaintiffs' particularized allegations provide but one year of compensation for comparison:  2021.[161]  In that year, according to the Complaint, Falberg earned $1,553,670, 19.1% of which is attributed to her director fees at Trade Desk.

The particularized allegations of Falberg's director compensation at Trade Desk cannot, without more, create a reasonable inference that Falberg cannot consider demand.  *Compare BGC P'rs*, 2019 WL 4745121, at *12–13 (holding that compensation constituting "over 30%" of a director's annual income, together with $65 million in donations to the director's then-employer, further ties through that

---

personal wealth by up to 50%.  *Id.*  By contrast, going only off Falberg's wealth as alleged in the Complaint, even aggregating six years of director compensation from Trade Desk matches a mere 12–13% of Falberg's personal wealth, and her annual director compensation from Trade Desk was only 19% of her publicly reported income in 2021. *Trados* discussed a different issue of a different magnitude, and Plaintiffs' reliance thereon is unavailing.

[160] *See* Compl. ¶ 205 ("In addition to Trade Desk, Falberg currently serves on the board of four other publicly-traded companies:  (a) Arcus Biosciences, Inc., where she has served since September 2017, earning $1,265,047 compensation in the aggregate, including $373,270 in 2021; (b) Nuvation Bio, where she has served since October 2020, earning $1,152,600 compensation in the aggregate, including $351,726 in 2021; (c) Urogen Pharma Ltd., where she has served since April 2017, earning $1,348,231 compensation in the aggregate, including $202,688 in 2021; and (d) Tricida, Inc., where she has served since May 2018, earning $1,700,459 compensation in the aggregate, including $329,000 in 2021.").

[161] Plaintiffs contend in their briefing, without citation to the record, that Falberg's income from her service on Trade Desk's Board "represents over 25% of her total income."  Pls.' Answering Br. 90.  It is not clear to the court how Plaintiffs got to this number, and Plaintiffs only specifically alleged Falberg's actual income from her other positions, year for year, in 2021.

institution, and an expectancy of future positions, supported a pleadings-stage conclusion that demand was futile as to that director), *and Emerging Commc'ns*, 2004 WL 1305745, at \*34 (concluding that amounts representing 22.5% of a director's income, together with a one-time payment of similar value the year of the challenged conduct, additional annual payments, and the controller's power over the director's son-in-law's consulting arrangement, supported a post-trial finding that the director was not independent), *with Kraft Heinz*, 2021 WL 6012632, at \*11–13 (concluding that a director's compensation constituting 17% of his publicly reported income, classification as not independent under the NASDAQ listing standards, and prior consulting relationship did not overcome the director's presumed independence for purposes of demand).

The well-pleaded, particularized allegations in the Complaint concerning Falberg's brief tenure at AdECN 15 years before this action, along with her director compensation and stock holdings, do not give rise to a reasonable inference that Falberg lacks independence from Green. Accordingly, the court concludes that Plaintiffs have not sufficiently called into question Falberg's ability to consider a demand impartially.[162]

---

[162] This is so even if the court considers Plaintiffs' "controlled mindset" argument in the analysis of Falberg's independence, as this court did in *In re Viacom Inc. Stockholders Litigation*, 2020 WL 7711128 (Del. Ch. Dec. 29, 2020), *as corrected* (Dec. 30, 2020).

*       *       *

In sum, the well-pleaded, particularized allegations in the Complaint give rise to a reasonable inference that Pickles lacks independence from Green. The allegations as to Paley, Buyer, and Falberg, however, are insufficient to create reasonable doubt as to their independence. The court turns next to Plaintiffs' argument that the Director Defendants face a substantial likelihood of liability.

### D. The Director Defendants Do Not Face a Substantial Likelihood of Liability from This Litigation.

Demand is excused as to any director who "faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand." *Zuckerberg II*, 262 A.3d at 1059. Plaintiffs contend that Falberg, Rajaram, Wells, Buyer, and Paley cannot consider a demand because they face a substantial likelihood of liability from Plaintiffs' claims.

Falberg, Rajaram, and Wells served on the Compensation Committee which negotiated and recommended that the Board approve the Award to Green. They,

---

There, on a motion to dismiss under Rule 12(b)(6), this court concluded that the circumstances of directors' appointments, the directors' prior relationships with the controller, the controller's demonstrated history of ouster, and the special committee's "controlled mindset," "taken together," impugned directors' independence. *Id.* at *25. But here, Plaintiffs' allegations regarding Falberg's personal relationships and controlled mindset are weaker than in *Viacom*, Plaintiffs proffer no allegations regarding retributive behavior by Green, and the relevant standard of review is materially higher. And, in any event, Plaintiffs themselves did not advance this lack of independence argument with respect to Falberg, or any of the other Director Defendants.

57

along with Buyer and Paley, also approved the Award at the Board level. Each has been named as a defendant for alleged breach of fiduciary duty.

Having been named as defendants in this action does not mean that these five directors are incapable of considering a demand. "Demand is not excused solely because the directors would be deciding to sue themselves." *Citigroup*, 964 A.2d at 121. It is also beyond question that a director does not face a substantial likelihood of liability for demand purposes merely because the director voted to recommend or approve the transaction that is at issue in the litigation. *Aronson*, 473 A.2d at 815 ("[T]he mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors."); *Grobow v. Perot*, 526 A.2d 914, 924 (Del. Ch. 1987) ("It is now well-settled that an allegation that a majority of directors approved, participated, or acquiesced in a challenged transaction will not, in and of itself, establish demand futility. The claim that the directors would be required to sue themselves, or that any action brought would be in hostile hands and not diligently prosecuted, has also been rejected by the Delaware Supreme Court and this Court." (citations omitted)), *aff'd*, 539 A.2d 180 (Del. 1988), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

> Rather, demand will be excused based on a possibility of personal director liability only in the rare case when a plaintiff is able to show director conduct that is "so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists."

*Citigroup*, 964 A.2d at 121 (quoting *Aronson*, 473 A.2d at 815).

Plaintiffs cannot satisfy their burden by engaging in group pleading. "[E]ach director has a right to be considered individually when the directors face claims for damages in a suit challenging board action." *In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173, 1182 (Del. 2015); *see also id.* at 1183 (explaining that our Supreme Court has "refused to presume that an independent director is not entitled to the protection of the business judgment rule solely because the controlling stockholder may itself be subject to liability for breach of the duty of loyalty if the transaction was not entirely fair to the minority stockholders"). Therefore, notwithstanding the presumptive application of the entire fairness standard of review to a claim challenging Green's conduct, "a separate, start-from-scratch review of the allegations against the Director Defendants is necessary." *CBS*, 2021 WL 268779, at *37.

As a matter of first principles, each director is presumed to have acted in conformity with her fiduciary duties. *Aronson*, 473 A.2d at 812; *Beam*, 845 A.2d at 1048. To rebut this presumption on the grounds that a director faces a substantial likelihood of liability, Plaintiffs must "make a threshold showing, through the

allegation of particularized facts, that their claims [against each director] have some merit." *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993). Plaintiffs cannot make this showing with allegations supporting a breach of the duty of care because the Trade Desk directors possess the protection of an exculpatory provision in the Company's certificate of incorporation. Under that provision, adopted in accordance with Section 102(b)(7) of the DGCL, the directors cannot be held liable for money damages for violations of the duty of care. 8 *Del. C.* § 102(b)(7) (providing that a certificate of incorporation may include a provision "eliminating or limiting the personal liability of a director or officer to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director or officer," subject to specified exceptions). As a result, Plaintiffs acknowledge that they must plead with particularity a substantial likelihood of liability on a non-exculpated claim.[163] Under Section 102(b)(7), a director cannot be exculpated for violations of the duty of loyalty. *Id.* (providing that "such provision shall not eliminate or limit the liability of . . . [a] director or officer for any breach of the director's or officer's duty of loyalty to the corporation or its stockholders"). Where, as here, there is no allegation that the Director Defendants received a personal financial benefit or were otherwise interested in the transaction, the Plaintiffs can only establish a claim for breach of

---

[163] Pls.' Answering Br. 40 ("Because the Company's Charter has an exculpation clause, that analysis turns on whether Plaintiffs adequately pled that these Defendants breached their duty of loyalty."); *see Zuckerberg II*, 262 A.3d at 1054, 1060.

the duty of loyalty by alleging that the Director Defendants' conduct amounted to bad faith. "Whether a director faces a substantial likelihood of liability from a non-exculpated claim 'turns primarily on . . . whether the complaint pleads particularized facts that support a reasonable inference that the director's decision could be attributed to bad faith.'" *Brookfield*, 2022 WL 223464, at \*11 (alteration in original) (quoting *Zuckerberg I*, 250 A.3d at 890); *see In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, 2016 WL 3044721, at \*1 (Del. Ch. May 20, 2016) (indicating that even independent, disinterested directors can violate their fiduciary duties by engaging in bad faith conduct).

Plaintiffs contend that they have alleged particularized facts supporting a reasonable inference that all three members of the Compensation Committee structured, and that each of the Director Defendants approved, the Award in bad faith. This is no easy task. "Demonstrating that directors have breached their duty of loyalty by acting in bad faith goes far beyond showing a questionable or debatable decision on their part." *Ironworkers Dist. Council of Phila. & Vicinity Ret. & Pension Plan v. Andreotti*, 2015 WL 2270673, at \*27 (Del. Ch. May 8, 2015), *aff'd*, 132 A.3d 748 (Del. 2016) (TABLE). Instead, Plaintiffs must plead facts giving rise to a reasonable inference that each of the Director Defendants acted with scienter. *See IBEW Local Union 481 Defined Contribution Plan & Tr. ex rel. GoDaddy, Inc. v. Winborne*, 301 A.3d 596, 619–23 (Del. Ch. 2023), *as corrected* (Sept. 7, 2023);

61

*Kahn v. Stern*, 183 A.3d 715 (Del. 2018) (TABLE) (citing *Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 258–60 (Del. 2017), *as revised* (Mar. 28, 2017)); *Morrison v. Berry*, 2019 WL 7369431, at *14 (Del. Ch. Dec. 31, 2019) ("A demonstration of bad faith requires acts or omissions taken against the interest of the Company, with scienter."); *Ironworkers*, 2015 WL 2270673, at *27 ("For the actions of directors to have been in bad faith, the directors must have acted with scienter, *i.e.*, with a motive to harm, or with indifference to harm that will necessarily result from the challenged decision."). "Where (as here) there is no adequate pleading of conflicted interests or lack of independence on the part of the directors, the scienter requirement compels that a finding of bad faith should be reserved for situations where" it is reasonably conceivable that "the nature of the director's actions can in no way be understood as in the corporate interest." *In re USG Corp. S'holder Litig.*, 2020 WL 5126671, at *29 (Del. Ch. Aug. 31, 2020) (cleaned up), *aff'd sub nom. Anderson v. Leer*, 265 A.3d 995 (Del. 2021) (TABLE). Because Plaintiffs allege bad faith as the basis for demand futility, they must "plead particularized facts that can support a reasonable inference about the directors' state of mind." *Winborne*, 301 A.3d at 619.

The exact scope of conduct constituting bad faith has gone intentionally undefined in our case law. *See In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006) ("To engage in an effort to craft [] a definitive and categorical definition

of the universe of acts that would constitute bad faith would be unwise." (footnote and internal quotation marks omitted)); *Chelsea Therapeutics*, 2016 WL 3044721, at *1 (explaining that "[t]he good-faith corollary to the duty of loyalty is something of a catchall," prohibiting knowing harm, intentional dereliction of duty, and providing "the equity judge something akin to a 'fiduciary out' from the business judgment rule, for situations where, even though there is no indication of conflicted interests or lack of independence on the part of the directors, the nature of their action can in no way be understood as in the corporate interest: *res ipsa loquitur*," among other theories). Although bad faith conduct is not precisely defined, it includes "conduct motivated by an actual intent to do harm" or "a conscious disregard for one's responsibilities." *Disney*, 906 A.2d at 64, 66; *but see id.* at 64–66 (explaining that "fiduciary action taken solely by reason of gross negligence and without any malevolent intent" is "clearly" not bad faith conduct and that "[t]here is no basis in policy, precedent or common sense that would justify dismantling the distinction between gross negligence and bad faith").

### 1. Plaintiffs cannot satisfy their pleading burden by pointing to process flaws and accusing the Director Defendants of having acted with a "controlled mindset."

Plaintiffs do not allege specific conduct, on a director-by-director basis, giving rise to an inference of bad faith conduct. Rather, they argue that, collectively, the Director Defendants face a substantial likelihood of liability for having acted

with a "controlled mindset." Plaintiffs' controlled mindset theory relies on a mix of cases discussing "controlled mindset" and others discussing bad faith conduct.

The phrase "controlled mindset" finds its origins in our law in Chief Justice, then-Chancellor, Strine's post-trial opinion in *In re Southern Peru Copper Corp. Shareholder Derivative Litigation*, 52 A.3d 761 (Del. Ch. 2011), *aff'd sub nom. Americas Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012). There, a special committee of "competent, well-qualified individuals with business experience," sufficient resources, and respected advisers had their "hands [] on the oars," but "their boat [went], if anywhere, backward." *Id.* at 797. The court concluded that this seemingly capable crew foundered because it had been "stilted and influenced by its uncertainty about whether it was actually empowered to negotiate," "accepted that only one type of transaction was on the table," and "allowed [itself] to be hemmed in by the controlling stockholder's demands." *Id.* at 797–98, 801. Thus, the process was flawed from the outset and the facts revealed that the special committee engaged in the "self-defeating practice of negotiating with itself— perhaps without even realizing it—through which it nixe[d] certain options before even putting them on the table." *Id.* at 800. As the Chief Justice described this phenomenon, "from inception, the Special Committee fell victim to a controlled mindset" and the resulting "strange deal dynamic" manifested an unfair process and produced an unfair price. *Id.* at 798, 813.

Since *Southern Peru*, the phrase "controlled mindset" has become a shibboleth for stockholder plaintiffs to characterize the conduct of a board or committee that negotiates against an alleged controller.[164] So too here, as the Plaintiffs rely on *Southern Peru* and other post-trial opinions discussing various process failures in support of their theory of bad faith conduct.[165] For starters, it is important to note that in *Southern Peru*, controlled mindset was not applied as a

[164] *See, e.g.*, *Sciabacucchi v. Liberty Broadband Corp.*, C.A. No. 11418-VCG (Del. Ch.), Dkt. 326 at 123; *In re BGC P'rs, Inc. Deriv. Litig.*, Consol. C.A. No. 2018-0722-LWW (Del. Ch.), Dkt. 268 at 66–67; *Franchi v. Firestone*, C.A. No. 2020-0503-KSJM (Del. Ch.), Dkt. 18 at 25–27, 31; *In re Match Gp., Inc. Deriv. Litig.*, C.A. No. 2020-0505-MTZ (Del. Ch.), Dkt. 100 at 48, 51, 54; *City Pension Fund for Firefighters & Police Officers in City of Mia. v. The Trade Desk, Inc.*, C.A. No. 2021-0560-PAF (Del. Ch.), Dkt. 1 ¶¶ 17, 112–13; *Harrison Metal Cap. III, L.P. v. Mathé*, C.A. No. 2022-0261-PAF (Del. Ch.), Dkt. 35 at 45; *Sciannella v. AstraZeneca UK Ltd.*, C.A. No. 2023-0125-PAF (Del. Ch.), Dkt. 1 ¶ 162.

[165] For example, Plaintiffs spent much of oral argument analogizing the allegations in the Complaint to the facts found in the post-trial opinion in the *Tornetta* action. *But see Tornetta v. Musk* (*Tornetta II*), 310 A.3d 430, 510–11, 520, 522, 531–32 (Del. Ch. 2024) (invoking the concept of a "controlled mindset" in concluding that the CEO was a controller, that disclosures that directors were "independent" were misleading, and that the process was unfair, but *not* in support of the proposition that any of the directors had acted in bad faith). Plaintiffs also relied on comparisons to *Loral* in their briefing. *But see Loral*, 2008 WL 4293781, at *33 & n.163 (observing that the court "would have to find that the Special Committee members . . . acted in bad faith" to hold them liable for a monetary remedy but declining to do so because it was unnecessary for what the court considered the appropriate remedy, stating that "[i]f MHR or another party has my judgment overturned and the Supreme Court returns the case to me for the entry of a damages award, I can address the individual responsibility of these defendants then"—an appeal not taken after the court denied the plaintiffs' motion for reargument).

theory of liability against the special committee.[166]  It was a description of extreme

and otherwise inexplicable process failures that contributed to a finding of liability

against the controlling stockholder in that case.

What, then, of Plaintiffs' theory that controlled mindset can itself give rise to

liability?  Plaintiffs argue that it is grounded in *Viacom*, which explained that a

"controlled mindset" contributed to the court's conclusion that it was reasonably

conceivable that a board committee lacked independence.[167]  Plaintiffs then point to

*CBS*, where this court concluded that it was reasonably conceivable that directors

breached their duty of loyalty through bad faith conduct, and later cases citing *CBS*.

Plaintiffs also rely generally on a mix of post-trial decisions discussing unfair

processes.

---

[166] The special committee members faced no liability in *Southern Peru*.  They had been dismissed earlier on a motion for summary judgment "because the plaintiff had failed to present evidence supporting a non-exculpated breach of their fiduciary duty of loyalty."  *S. Peru*, 52 A.3d at 785; *see In re S. Peru Copper Corp. S'holder Deriv. Litig.* (*S. Peru MSJ Transcript*), C.A. No. 961-CS, at 123:22–129:5 (Del. Ch. Dec. 21, 2010) (TRANSCRIPT). The plaintiffs had not raised the controlled-mindset argument at that stage and did not challenge the committee members' independence.  *See Viacom*, 2020 WL 7711128, at *24 n.265.

[167] Vice Chancellor Slights provided a careful analysis and application of the controlled-mindset theory in *Viacom*, which the court need not attempt to replicate here.

Under *Southern Peru*,[168] "controlled mindset" describes a latent inability to perceive a conflict that is, at its core, a process failure.[169] Like other mere process failures, it can, if combined with other well-pleaded allegations, contribute to a broader constellation of facts that support a finding or reasonable inference of disloyal conduct.[170] But a stockholder plaintiff cannot merely slap a "controlled mindset" label onto a process or result with which it disagrees and expect to wrest

---

[168] Only one opinion of our Supreme Court has used the "controlled mindset" moniker: *Americas Mining*, in which the Court affirmed *Southern Peru*. There, the Supreme Court accepted post-trial findings of unfair process and unfair price. But the Court's opinion in *Americas Mining* did not opine upon the scope of "controlled mindset" beyond affirming the findings of the court below. *Cf. generally Viacom*, 2020 WL 7711128 (citing to and discussing *Southern Peru*, not *Americas Mining*, for the scope of this theory). The phrase has not appeared in any Supreme Court opinion since then.

[169] *S. Peru*, 52 A.3d at 800 (explaining that a special committee operating under a controlled mindset "engages in the self-defeating practice of negotiating with itself—perhaps without even realizing it"). As articulated in *Southern Peru*, operating under a controlled mindset is, alone, at most a breach of the duty of care. *S. Peru MSJ Transcript*, C.A. No. 961-CS, at 123:22–129:5 ("Where I am going to grant summary judgment is for the members of the special committee. [Section] 102(b)(7) is in our law. It's an important thing. . . . The dismissal of the special committee defendants doesn't do anything to diminish the right to recover against the interested party. It represents no finding about the effectiveness of the special committee. It simply means that I don't believe the record contains evidence supporting a rational inference of a nonexculpated breach of fiduciary duty claim against those defendants, and I'm going to grant their dismissal.").

[170] *See, e.g.*, *Viacom*, 2020 WL 7711128, at *23–25 (concluding that a controlled mindset, taken together with other allegations, undermined directors' independence from a controller); *cf. CBS*, 2021 WL 268779, at *37–43 (eschewing an independence analysis entirely and instead determining that directors faced a substantial risk of liability because objective facts gave rise to a reasonable inference that they "breached their fiduciary duty of loyalty by approving the patently unfair Merger in order to appease [] Redstone"—a quintessential bad faith analysis without a single mention of "controlled mindset"). This court has also found the existence of a controlled mindset in negotiators to support a finding of transaction-specific control, reasoning that negotiators' inability to perceive a conflict enhanced the controller's influence over the transaction. *Tornetta II*, 310 A.3d at 520.

control of a claim from a majority independent and disinterested board of directors. Plaintiffs must still satisfy their obligations under Rule 23.1 to plead particularized facts supporting an inference of bad faith conduct amounting to a breach of the duty of loyalty. *See Winborne*, 301 A.3d at 623 ("At the pleading stage, the test is whether the complaint alleges a constellation of particularized facts which, when viewed holistically, support a reasonably conceivable inference that an improper purpose sufficiently infected a director's decision to such a degree that the director could be found to have acted in bad faith. Everything goes into that mulligan stew.").

### 2. Plaintiffs rely on authorities addressing extreme facts not present here.

Plaintiffs attempt to equate the Compensation Committee's process with the processes depicted in *Viacom*, *CBS*, *Tornetta II*, and *Berteau*.[171] A brief review of those cases shows much more controller interference and resulting influence than what can be reasonably inferred here.[172]

In *Viacom*, the plaintiffs challenged the independence of the members of the special committee that negotiated a merger between Viacom, Inc. ("Viacom") and

---

[171] Only two of these cases discuss controlled mindset. *Compare Viacom*, 2020 WL 7711128 (citing *Southern Peru* and discussing controlled mindset), *and Tornetta II*, 310 A.3d 430 (same), *with CBS*, 2021 WL 268779 (citing *Southern Peru* but not discussing controlled mindset), *and Berteau v. Glazek*, 2021 WL 2711678 (Del. Ch. June 30, 2021) (neither citing *Southern Peru* nor discussing controlled mindset).

[172] This opinion does not attempt to replicate the painstakingly detailed recitations of pertinent facts and allegations in each of these lengthy opinions, of which this opinion repeats but a small fraction.

CBS Corporation ("CBS"), both of which were controlled by National Amusements, Inc. ("NAI"), and, ultimately, Shari Redstone. 2020 WL 7711128, at *2. Redstone installed these individuals to replace non-compliant independent directors, and the facts created a reasonable inference that they had consistently prioritized Redstone's interests over years of negotiation over the transaction. *Id.* at *6–9, *23. The *Viacom* court determined that a collection of well-pleaded allegations detailing the individuals' relationships with Redstone, Redstone's demonstrated history of retributive behavior, and years of pervasive subservience indicating a controlled mindset by the directors who Redstone brought in after cleaning house several years earlier supported a pleadings-stage inference that these directors lacked independence from Redstone. *See id.* at *25.

*CBS* addressed a pleadings-stage challenge on the other side of the Viacom/CBS transaction.[173] In *CBS*, the plaintiffs alleged a history of the prior board's having rejected Redstone's insistence upon a Viacom/CBS deal, after which

---

[173] "In a rare, but not unheard of twist," Vice Chancellor Slights was tasked with considering "the same story, the story of the Viacom/CBS merger" as alleged by aggrieved stockholders of each company. *CBS*, 2021 WL 268779, at *1. As Vice Chancellor Slights explained in *CBS*, it was reasonable to infer that Redstone had pushed for a transaction that appeared value destructive for both corporations individually because it provided a non-ratable benefit to NAI, which Redstone hoped to sell. *Id.* at *8, *36 ("According to NAI's advisors, if Viacom and CBS were to combine, then NAI could expect a sale premium as high as 50%. . . . Plaintiffs' particularized allegations allow a reasonable inference that CBS's acquisition of Viacom was motivated not only by [] Redstone's concerns about Viacom's viability as a going concern, but also her desire to shop NAI following their consolidation.").

Redstone replaced six of the CBS directors. The new board "stood in stark contrast" to the members of the predecessor board, and "welcomed the controller, with all her self-interest, into the huddle." *CBS*, 2021 WL 268779, at *43. The members of the new CBS committee—a majority of whom were new Redstone appointees—then capitulated on nearly every point, "assent[ed] to . . . constraints on their mandate without protest," ignored Redstone's violation of a settlement agreement prohibiting merger talks, and did not attempt to secure the unaffiliated vote condition that had been a constant for years of negotiation. *Id.* at *9, *37, *40–42; *see also id.* at *41 (recounting that the few holdover directors "did not even explain to the CBS Committee the reasons for their past fervent opposition to a Viacom/CBS merger, even though no relevant circumstances had changed"). These and other particularized "unique" and "extreme" facts, "combined with the documented evidence of [] Redstone's dogged determination to make this deal happen 'one way or the other,'" supported the court's conclusion that a majority of the demand board faced a substantial likelihood of liability. *Id.* at *42–43, *47.

In *Tornetta II*, a post-trial opinion, this court found that an entirely conflicted compensation committee negotiated and recommended the challenged equity grant, which was ultimately approved by a majority conflicted board. 310 A.3d at 508–10,

70

532.[174] In addition to the conflicts identified in *Tornetta II*, the controller, Elon Musk, was found to have exercised extraordinary influence on the entire process. For example, "before the Board or Compensation Committee had a substantive discussion concerning the Grant, Musk's team proposed a highly accelerated schedule that contemplated approval of the Grant within less than two months," "[t]he committee's independent advisors asked for more time and were told no," and Musk unilaterally stalled and accelerated the process over a period of months in a manner that "made it tough for the directors and their advisors to meaningfully evaluate the Grant and respond." *Id.* at 528–29. The *Tornetta II* court also found that: (a) "Musk made an initial proposal, and that proposal was the only one seriously considered until Musk unilaterally changed it six months later," (b) "[t]he Compensation Committee did not consider alternatives," and (c) the compensation committee neither received nor asked its advisers to provide a benchmarking analysis to compare the grant to awards made by other corporate boards, even though "[b]enchmarking is the foundation of a compensation advisor's analysis." *Id.* at 515, 517–19, 530–31.

---

[174] This case and the opinions in the *Tornetta* action involve fundamentally different inquiries, rendering their comparison inexact. As a procedural matter, the defendants in *Tornetta* elected not to seek dismissal under Rule 23.1. *Tornetta I*, 250 A.3d at 797 n.5; *Tornetta II*, 310 A.3d at 496 n.541. And substantively, the issue before the court here is whether the directors face a substantial likelihood of liability for having engaged in bad faith conduct; *Tornetta II* was an entire fairness analysis, and neither opinion in *Tornetta* addressed whether the directors' conduct amounted to bad faith.

71

Each of these cases—*Viacom*, *CBS*, and *Tornetta II*—involved extreme, exhaustively detailed facts showing pervasively flawed processes. And in *Berteau*, the court, which never used the phrase "controlled mindset," considered stark, startling facts that gave rise to a pleadings-stage inference of disloyal conduct under the more permissive Rule 12(b)(6) standard. The *Berteau* court concluded that it was reasonably conceivable that the special committee allowed management of a controlled company to select its counsel, successfully negotiated for but inexplicably abandoned a majority-of-the-minority vote condition, and capitulated to the controller's price terms after the controller flexed its authority in a hastily convened Sunday morning board meeting. *Berteau*, 2021 WL 2711678, at *22–24; *see also id.* at *23 (noting that the complaint further alleged that, after closing, the special committee failed to respond to the controller's breach of the merger agreement to profit the controller at the company's expense). The complaint contained well-pleaded facts which, collectively, created a reasonable inference that the controller overtly influenced the special committee's process on multiple occasions, and that the special committee was doing little more than trying to hide its abdication of its fiduciary duties behind negotiations "limited to the minimum necessary to confer a scintilla of legitimacy" to its process. *Id.* at *24.

As this court recently observed in *Winborne*, "[b]ad faith is a state of mind," and "[a]n individual's mental state is not directly observable." 301 A.3d at 619–20.

72

"Without the ability to read minds, a trial judge only can infer a party's subjective intent from external indications. Objective facts remain logically and legally relevant to the extent they permit an inference that a defendant lacked the necessary subjective belief." *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 178 (Del. Ch. 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015) (TABLE). In each of *Southern Peru*, *Viacom*, *CBS*, *Tornetta II*, and *Berteau*, this court focused on directors' responses to interfering actions, not merely the presence of a controlling stockholder, as the pertinent objective indicia. What mattered was the "mindset," not the existence of "control."[175]

---

[175] "To be sure, a director's appointment by a controller 'is not necessarily irrelevant.'" *Harrison Metal Cap. III, L.P. v. Mathé*, 2024 WL 1299579, at *10 (Del. Ch. Mar. 27, 2024) (quoting *Ezcorp*, 2016 WL 301245, at *41). And "the Court cannot ignore the role of the controller in evaluating the loyalty of the Director Defendants." *CBS*, 2021 WL 268779, at *38. But the *mere presence* of a controller is not enough to undermine our law's fundamental presumption that directors "were faithful to their fiduciary duties"—a foundation of Delaware's board-centric model of corporate governance. *Beam*, 845 A.2d at 1048; *see id.* at 1054 (explaining that, without more, a "stockholder's control of a corporation does not excuse presuit demand on the board"); *Aronson*, 473 A.2d at 815 ("[E]ven proof of majority ownership of a company does not strip the directors of the presumptions of independence, and that their acts have been taken in good faith."); *cf. Ezcorp*, 2016 WL 301245, at *40, *42 ("[A] director's nomination or election by an interested party is, standing alone, insufficient to raise a reasonable doubt about his or her independence. . . . [But] giving pleading-stage effect to a controller's actual threats and retributive behavior has important integrity-preserving consequences. If a controller anticipates that threats will have legal consequences for demand futility and other doctrines, then he should be less likely to make and carry them out. That in turn should enable outside directors to better fulfill the meaningful role that Delaware law contemplates."); *see, e.g., Viacom*, 2020 WL 7711128, at *21–22 (discussing "Redstone and NAI's Demonstrated History of Ouster"); *CBS*, 2021 WL 268779, at *38 (describing Redstone as "active, and at times, retributive").

In sum, to give rise to a reasonable inference that the members of the Compensation Committee are subject to a substantial likelihood of liability, Plaintiffs' particularized allegations must paint a picture not only of unfair process, or even of gross negligence,[176] but rather must point to external indications from which the court can infer a bad faith state of mind. *Winborne*, 301 A.3d at 619–20.

### 3. Plaintiffs' well-pleaded, particularized allegations do not give rise to a reasonable inference that the Director Defendants acted in bad faith.

Plaintiffs point to several observable indications that they argue support a reasonable inference of bad faith conduct. First, Plaintiffs emphasize Green's presence, either personally or through counsel, at Compensation Committee meetings, including during portions of the discussions of the Award. But Plaintiffs do not allege that Green or his counsel improperly influenced the Compensation Committee by their attendance and discussions with the committee. Green's mere presence does not provide meaningful support for an inference that the Compensation Committee acted in bad faith.

---

[176] Our Supreme Court has squarely rejected the proposition that "fiduciary action taken solely by reason of gross negligence and without any malevolent intent" violates the duty of loyalty. *Disney*, 906 A.2d at 64. As the Court explained, "[t]o adopt a definition that conflates the duty of care with the duty to act in good faith by making a violation of the former an automatic violation of the latter, would nullify" Section 102(b)(7) and portions of Section 145 of the DGCL, "and defeat the General Assembly's intent." *Id.* at 66. "There is no basis in policy, precedent or common sense that would justify dismantling the distinction between gross negligence and bad faith." *Id.*

The presence of Green and his counsel during portions of the Compensation Committee's meetings pales in comparison to the controllers' conduct in *CBS*, *Viacom*, *Tornetta II*, and even *Berteau*. The Complaint does not allege particularized facts comparable to the unflinching, reflexive capitulation of Viacom's special committee. Nor does it even hint of any history of threats or retributive conduct that would intimidate the Compensation Committee or cause its members to abandon their fiduciary obligations. Plaintiffs' allegations also fall well short of those in *CBS*, where directors reversed years of faithful conduct for no reason other than the controller's pressure. *See CBS*, 2021 WL 268779, at *41 (explaining that despite "independent CBS fiduciaries [having] recently and consistently worked strenuously to preserve" stockholders' interests, "each member resigned to [] Redstone's will, without regard for the stockholders to whom they owed fiduciary duties" even though "no relevant circumstances had changed" other than that "their will to resist was gone"); *see also Brookfield*, 2022 WL 223464, at *13 (explaining that "the court in *CBS* reached this conclusion in the face of particularly egregious facts, where controller-selected directors approved a merger with the controller after several previous failed merger attempts and after the board had repeatedly been advised that the merger was unfavorable"). And unlike in *Tornetta II*, Plaintiffs make no allegations regarding Green's control of the Compensation Committee's timing or process. *See Tornetta II*, 310 A.3d at 528–

75

29; *see also Berteau*, 2021 WL 2711678, at *23 (noting that the special committee appeared to capitulate to pressure from the controller, which abruptly put an end to negotiations).

"[T]he reality is that controllers come in different forms depending, in large measure, upon the extent to, and purpose for, which they exert their influence." *CBS*, 2021 WL 268779, at *38. In each of the cases upon which Plaintiffs rely, controlling stockholders waded into the fray and conspicuously influenced the process, flexing their authority to obtain the result they wanted at the expense of those to whom the directors owed fiduciary duties. By contrast, Plaintiffs' argument here largely boils down to gesturing at the nature of the Award and Green's having been present for portions of the Compensation Committee's meetings and discussing a framework for the Award. But that does not satisfy Plaintiffs' burden to plead facts with particularity to create a reasonable inference of bad faith conduct.

Plaintiffs also rest their bad faith argument on the theory that "the Mega Grant was 'initiated' by Green's demands at the January 6, 2021 [Compensation] Committee meeting and that he was 'the driving force behind it.'"[177] This contention

___

[177] Pls.' Answering Br. 47 (quoting *Frederick Hsu Living Tr. v. Oak Hill Cap. P'rs III, L.P.*, 2020 WL 2111476, at *36 (Del. Ch. May 4, 2020)). The full language, which Plaintiffs selectively quoted from *Oak Hill*, states: "The fair process inquiry examines how the decision under challenge was initiated. This includes examining the source of the idea and who was the driving force behind it." 2020 WL 2111476, at *36. It bears emphasis

ignores that the source of the idea for the Award was not Green—nor do Plaintiffs allege or argue that it was. Based on the pleadings-stage record, the idea originated either from Compensia or the Compensation Committee sometime in 2020.[178] Plaintiffs allege that the Straw Model was the first mega grant proposal before the

_____

that a fair process inquiry and a bad faith inquiry are not a perfect match conceptually. As Chief Justice Strine cautioned in his post-trial opinion in *Southern Peru*:

> The entire fairness standard ill suits the inquiry whether *disinterested directors* who approve a self-dealing transaction and are protected by an exculpatory charter provision authorized by 8 *Del. C.* § 102(b)(7) can be held liable for breach of fiduciary duties. Unless there are facts suggesting that the directors consciously approved an unfair transaction, the bad faith preference for some other interest than that of the company and the stockholders that is critical to disloyalty is absent. The fact that the transaction is found to be unfair is of course relevant, but hardly sufficient, to that separate, individualized inquiry. In this sense, the more stringent, strict liability standard applicable to interested parties . . . is critically different than that which must be used to address directors such as those on the Special Committee.

52 A.3d at 787 n.72. In any event, the Complaint does not plead with particularity that Green initiated the Award.

[178] Plaintiffs highlight that the phrase "the Committee determined to consider a large CEO equity grant further" does not appear in the minutes of the Compensation Committee's December 4, 2020 meeting, but does appear in several subsequent meeting minutes. *Compare* Dkt. 22 Ex. 16, *with id.* Exs. 17–19. From this, it is reasonable to infer that the Compensation Committee was undecided when it sought Green's input. Plaintiffs take this inch and try to stretch it a mile to suggest that the Compensation Committee did not initiate the process that led to the final Award. That is not a reasonable inference on this pleadings-stage record. The Complaint alleges that the Compensation Committee initially acquired advice on such a package alone, discussed it alone, and then brought the idea and the Straw Model to Green. Compl. ¶¶ 89, 115–16. In addition, the Complaint does not allege with particularity that Green drove the process or terms thereafter. *Cf. Tornetta II*, 310 A.3d at 514, 528–29 (explaining that, while the committee had proposed the concept of a grant, Musk then "repeatedly and unilaterally manipulated the timeline of the process" and proposed the initial structure and the subsequent changes, which he described as "me negotiating against myself" (internal quotation marks omitted)).

Compensation Committee and that it did not come from Green.[179]  *Cf. Tornetta II,*

310 A.3d at 530 ("Musk made an initial proposal, and that proposal was the only

one seriously considered until Musk unilaterally changed it six months later.").  But

even if the idea had come from Green, the central inquiry into whether the directors

engaged in bad faith conduct is not how the concept originated, but rather how they

reacted in response to it.

Plaintiffs next argue that the Compensation Committee "Knew a Mega Grant

Was Unnecessary to 'Retain' Green."[180]  Plaintiffs contend that, because of Green's

significant existing equity stake and the recent amendments to the Company's

certificate of incorporation extending Green's voting control, "the Committee knew

that Green was not going anywhere."[181]  This is a decent argument on unfair price.

*See Tornetta II,* 310 A.3d at 537–38.  It is not, however, a particularly strong

argument on bad faith.  *See Tornetta I,* 250 A.3d at 813–14 (describing similar

pleadings-stage allegations regarding unfair price as "lodged on the very outer

margins of adequacy" and allowing a claim for breach of fiduciary duty to proceed,

but explaining that the burden of "attacking a corporate transaction as wasteful is

---

[179] *See* Compl. ¶¶ 89–115 (alleging that "[t]he possibility of a Mega Grant was first discussed by the Compensation Committee at a December 4, 2020 meeting" not attended by Green, describing the Straw Model and other contents of the Compensia Presentation, and subsequently alleging "then Green intervened").

[180] Pls.' Answering Br. 54.

[181] *Id.* at 55.

necessarily higher than that of a plaintiff challenging a transaction as unfair" and dismissing a claim for waste (internal quotation marks omitted)); *Chelsea Therapeutics*, 2016 WL 3044721, at \*1 (explaining that this form of circumstantial bad faith allegation "is similar to the much older fiduciary prohibition of waste, and like waste, is a *rara avis*"). Of course, it is reasonable to infer that Green may have remained at the Company without the Award, and as a result, the Company might not have gotten the best deal. But it is not reasonable to infer based on the Plaintiffs' well-pleaded, particularized allegations that the Compensation Committee's decision to restructure Green's compensation to provide him further incentive to remain at Trade Desk was made in bad faith.

Plaintiffs' final theory is that the Compensation Committee "Disregarded Compensia's Recommendations."[182] This contention relies primarily on Plaintiffs' assertion that "Compensia had found no legitimate reason to deviate from the historical compensation structure."[183] This statement reflects Plaintiffs' independent assessment of the merits of the transaction, not a recommendation by the Compensation Committee's advisers. The Compensia Presentation provided the Straw Model mega grant, pros and cons of that and other compensation approaches, comparable special equity awards to CEOs, and a model directly comparing the

---

[182] *Id.* at 57.

[183] *Id.* at 46.

historic, Large Cap, and mega grant structures, and identified considerations for the Compensation Committee to evaluate.[184] It did not, however, provide explicit recommendations—to the contrary, it was a "DRAFT DISCUSSION DOCUMENT"[185] that presented a "summary of founder CEO compensation considerations" and "[k]ey questions and open issues."[186] Plaintiffs believe that another approach would have been more appropriate, and they attack Compensia's list of pros and cons.[187] But Plaintiffs' opinions on the merits of different approaches to executive compensation do not give rise to a substantial likelihood of outside-director liability here. *Brehm*, 746 A.2d at 266 ("[M]ere disagreement cannot serve as grounds for imposing liability based on alleged breaches of fiduciary duty and waste." (internal quotation marks omitted)).

Plaintiffs are correct that the final Award deviated from the Compensia Presentation's Straw Model mega grant. Several of the decision points were resolved in a manner favorable to Green, but some were not. For example, the final Award contained higher stock price hurdles than those contemplated in the Straw

---

[184] Compensia Presentation at TTD_Huizenga000762–65, TTD_Huizenga000767–69; *cf. Tornetta II*, 310 A.3d at 517–19, 531 (expressing concern about the committee's failure to seek or obtain a benchmarking analysis).

[185] Compensia Presentation at TTD_Huizenga000759.

[186] *Id.* at TTD_Huizenga000760.

[187] *See* Compl. ¶¶ 108–15 (challenging Compensia's pros and cons for various approaches by, for example, stating that "any reasonable person would realize this was not really a 'Con' at all" and complaining that "[t]here is no explanation why this is a 'Pro'").

Model. Plaintiffs' allegations over the difference between the terms of the Straw Model and final Award differ materially from *CBS* and *Berteau*, where directors' reversal of their own approach contributed to a constellation of facts giving rise to a reasonable inference of bad faith. Comparison to the Straw Model is of significantly lesser weight in the analysis than comparison to multiple rounds of negotiations by some of the same directors, and the clear interference that preceded the pivots in *CBS* and *Berteau* goes unalleged here. Moreover, the terms of the final Award are not so extreme as to, themselves, exceed the realm of reason and Plaintiffs, who have not asserted a waste claim, do not contend otherwise. *See Tornetta I*, 250 A.3d at 813–14 (dismissing a waste claim challenging a larger compensation package).

At bottom, Plaintiffs argue that the Compensation Committee recommended, and the Director Defendants approved, a "facially excessive Mega Grant through an unfair process [and] face a substantial likelihood of liability for doing so."[188] But "a failure to follow best practices is not necessarily a breach of fiduciary duty." *McElrath*, 2019 WL 1430210, at *16.

> [C]oncerns about lavish executive compensation and our institutional aspirations that boards of directors of Delaware corporations live up to the highest standards of good corporate practices do not translate into a holding that these plaintiffs have set forth particularized facts excusing a pre-suit demand under our law and our pleading requirements.

---

[188] Pls.' Answering Br. 39.

*Brehm*, 746 A.2d at 249.  The business judgment rule seeks to serve boards of directors and stockholders alike by enabling fiduciaries to take business risks.  *See Goldman*, 2011 WL 4826104, at *23 ("Through the business judgment rule, Delaware law encourages corporate fiduciaries to attempt to increase stockholder wealth by engaging in those risks that, in their business judgment, are in the best interest of the corporation 'without the debilitating fear that they will be held personally liable if the company experiences losses.'" (quoting *Citigroup*, 964 A.2d at 139)).

> The business judgment rule is an acknowledgment of the managerial prerogatives of Delaware directors under Section 141(a).  It is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.  Absent an abuse of discretion, that judgment will be respected by the courts.

*Aronson*, 473 A.2d at 812 (citations omitted).  This level of deference is the default applicable to the Compensation Committee's conduct, and Plaintiffs face an extraordinarily high bar to rebut the presumptive applicability of the business judgment rule to the conduct of disinterested and independent directors.

> Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty.  The business judgment rule thus provides something as close to non-review as our law contemplates.  This standard of review reflects and promotes the role of the board of directors as the proper body to manage the business and affairs of the corporation.

*In re McDonald's Corp. S'holder Deriv. Litig.*, 291 A.3d 652, 685 (Del. Ch. 2023) (citations and footnotes omitted) (internal quotation marks omitted); *see also Zucker v. Andreessen*, 2012 WL 2366448, at *8 (Del. Ch. June 21, 2012) ("While the discretion of directors in setting executive compensation is not unlimited, it is the essence of business judgment for a board to determine if a particular individual warrants large amounts of money, whether in the form of current salary or severance provisions." (cleaned up)). Plaintiffs' contention that the members of the Compensation Committee face a substantial likelihood of liability because they engaged in an "unfair process" misapprehends the governing standard, and Plaintiffs' allegations fall far short of impugning the Compensation Committee's ability to consider demand.

In sum, the Compensation Committee comprised disinterested and independent directors who sought reasoned advice, repeatedly met and discussed the challenged transaction, and made a business decision. As unconflicted fiduciaries who showed up and took steps to make a reasoned decision, their decisions are entitled to considerable deference under our law, and only extreme facts can give rise to a reasonable inference of bad faith conduct. Plaintiffs do not allege that Green has a history of retribution or exerted influence that inexplicably caused the Director Defendants to abandon a faithful course of action. Plaintiffs' well-pleaded, particularized allegations do not give rise to a reasonable inference that the

Compensation Committee—or any of the other Director Defendants—negotiated or approved the Award in bad faith.[189]  Therefore, Plaintiffs' allegations fail to give rise to a reasonable inference that any of the Director Defendants face a substantial likelihood of liability in connection with this litigation.

### E.    Plaintiffs Have Failed to Plead Particularized Facts Giving Rise to a Reasonable Inference that Demand Was Futile.

The Demand Board has eight members.  Plaintiffs' particularized allegations only raise reasonable doubt as to the ability of Green and Pickles to consider a demand.  Plaintiffs have failed to call into reasonable doubt Buyer's, Paley's, Falberg's, Rajaram's, Wells's, and Cunningham's ability to have considered a demand to institute litigation challenging the Award.  Because demand was not futile as to a majority of the Demand Board as of the filing of the original complaint, Plaintiffs have failed to plead sufficient facts to cause the court to divest the Board of its authority to control the litigation asset.

---

[189] Plaintiffs' also proffer this theory against Buyer and Paley, who, respectively, attended five and one of the Compensation Committee's meetings and, like the rest of the Director Defendants, voted to approve the Award.  Dkt. 22 Ex. 18 at TTD_Huizenga000474; *id.* Ex. 19 at TTD_Huizenga000476; *id.* Ex. 20 at TTD_Huizenga000478; *id.* Ex. 24 at TTD_Huizenga000489; *id.* Ex. 25 at TTD_Huizenga000491.  Plaintiffs' arguments against Buyer and Paley, which were presented in tandem with their arguments against the Compensation Committee, fail, both for the reasons discussed above and because Plaintiffs have failed to plead any particularized facts as to either's involvement other than their having voted for the transaction and sitting in on a few of the Compensation Committee's meetings.

## III.    CONCLUSION

For the forgoing reasons, Defendants' motions to dismiss under Rule 23.1 are

GRANTED, and the Complaint is dismissed with prejudice.